**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 12, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KAREN KIRKPATRICK,

　　　　　Plaintiff-Appellant,

v.

PFIZER, INC.,

　　　　　Defendant-Appellee.

No. 09-6116

(W.D. Oklahoma)

(D.C. No. 5:09-CV-00092-C)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

---

## I.　INTRODUCTION

Karen Kirkpatrick filed this lawsuit against Pfizer, Inc., her former employer, alleging various violations under the Age Discrimination in Employment Act ("ADEA") and Oklahoma law. The district court granted Pfizer's motion for summary judgment on Kirkpatrick's state-law outrage claim but allowed her age discrimination claim to proceed to trial. After the close of Kirkpatrick's evidence at trial, the district court granted Pfizer's Rule 50 motion,

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

concluding Kirkpatrick had failed to present sufficient evidence from which the jury could conclude her age played any role in Pfizer's decision to terminate her. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **AFFIRMS** the decisions of the district court.

## II.   BACKGROUND

Kirkpatrick began working as a pharmaceutical sales representative for Pfizer in 2000, after Pfizer acquired Parke-Davis, her former employer. She remained at Pfizer until her termination on August 21, 2006. At the time of her termination, Kirkpatrick was fifty-five years old.

As a sales representative, Kirkpatrick routinely called on physicians, hospitals, and other healthcare providers and explained the benefits of Pfizer's pharmaceutical products to generate sales of prescription medications. The marketing and distribution of prescription drugs is regulated by the U.S. Food and Drug Administration ("FDA") and is subject to the Prescription Drug Marketing Act ("PDMA"). Pfizer's sales representatives distribute samples of Pfizer's products, called "starters," to allow doctors to start patients on a course of therapy with the drug. Whenever a sales representative gives a starter to a doctor, the representative is required by Pfizer policy and the PDMA to complete a "starter form." The starter form must be completed by the sales representative, signed by the doctor, and dated by the sales representative each time starters are delivered to a doctor.

Pfizer must make all starter forms available to the FDA and must also report any intentional misstatement on a starter form to the FDA. "Banking" starter forms (re-dating them to create the impression of regular sales activity) or otherwise falsifying starter forms in any way is both a federal crime and a violation of Pfizer's policies. Pfizer's policies require sales representatives to input their starter transactions on a daily basis into an electronic database, which Pfizer uses to oversee starter activity.

In September 2005, Pfizer underwent a nationwide reorganization. As a result, a large portion of the sales force across the country obtained new managers and/or were given new sales territories. As a result of this reorganization, Geoff Holt became Kirkpatrick's district manager and Curt McAllister became her regional manager. When Kirkpatrick first met Holt at a meeting on September 12, 2005, he immediately pulled her aside and said, "Karen, hey, Curt McAllister and I were in the bar last night and we didn't realize that you were as old as you are." Kirkpatrick twice asked Holt what he meant, but Holt refused to respond. When the two met again in October 2005, Holt told Kirkpatrick, "Well, you certainly have been doing this a long time now. Have you thought about retirement?" Kirkpatrick told Holt she had never thought about retirement, that she liked her job and had a son just about to start college and therefore needed to work.

Later in 2005, on a field ride while Kirkpatrick was driving, Holt put his hand on the back of her seat and said, "you know, Karen, in my other position I

got three people fired." When Kirkpatrick made suggestions, Holt would respond "Karen, that's just old school" and would refuse to consider them. Kirkpatrick confronted Holt in early 2006 about the pressure mounting on her at the workplace and notified him the added stress was causing her diverticulitis to flare up. To the best of Kirkpatrick's recollection, Holt again responded by asking her, "Have you thought about retirement?" When Kirkpatrick's worsening diverticulitis required her to frequently stop to use the restroom during a subsequent field ride, Holt asked, "Well, what took you so long?" After Holt later stated he wanted Kirkpatrick in the field from 8:00 to 5:00, unless she was in a doctor's office or pharmacy, Kirkpatrick asked, "Does this mean like if I have a flare-up that I'm supposed to call you and let you know I'm in the restroom?" Holt responded, "Yes." Holt also required Kirkpatrick to adhere to a predetermined call schedule. There was no evidence Holt made any similar comments or treated any other employee under the age of forty in a similar manner. For example, Holt permitted a younger employee, Meredith Edwards, to complete her required calls at her discretion over the course of a week.

In late June or early July 2006, McAllister noticed Kirkpatrick's name on a "No Starter Activity" report and contacted Holt. Holt prepared a written report entitled "Work Ethic concerns about Karen Kirkpatrick," in which he wrote, *inter alia*, that Kirkpatrick appeared to be "spreading" starter forms because her forms were "consistently out of order" and there were instances in which her "forms for

single clinics were spread over multiple days." Holt noted an instance in which starter forms for six doctors in the same office "appeared to be stock piled from different actual call days," but were all dated June 23.

Holt and McAllister then met with Elizabeth Chaudhari, a manager in Pfizer's Human Resources Department, and provided her with a copy of Holt's report. Following this meeting, Chaudhari contacted James Batura, Pfizer's Director for PDMA compliance, and requested him to prepare a report on Kirkpatrick's starter forms. This report captured data on several aspects of Kirkpatrick's starter activity, including the number of days elapsing between the date of each starter transaction and the date Kirkpatrick electronically input the transaction, and instances in which starter forms from different pads were entered as being used in the same day or forms from the same pad were used out of sequential order. These indicators were compiled to determine whether there was cause to believe Kirkpatrick was entering incorrect dates on her starter forms, or otherwise submitting false information to Pfizer to cover up a lack of consistent sales activity.

Batura's report showed that Kirkpatrick often entered the starter transactions into the electronic database weeks, and in some cases months, after the transaction had occurred. It also showed that Kirkpatrick, in reporting her daily starter activity, entered forms from several different pads simultaneously, including one day on which she entered forms from at least seven different pads,

including forms from five different pads for purported sales calls in the same office.  Further, it noted Kirkpatrick's forms from the same pad were often submitted out of sequence and identified several starter forms on which Kirkpatrick appeared to have altered the date.  Holt reviewed Batura's report and cross-referenced it to the information Holt already had from Kirkpatrick's weekly call activity reports and travel and expense reports.  Holt found several additional discrepancies by comparing the dates of restaurant receipts and turnpike toll pass records to the dates listed on Kirkpatrick's starter forms.  Holt continued to analyze Kirkpatrick's starter form data for the period from February 2005 to July 2005, and prepared a spreadsheet identifying thirty instances of suspicious starter-form activity.

Pfizer did not, however, conduct a longitudinal audit of Kirkpatrick's starter forms, which would have involved sending starter forms to doctors and asking whether they could confirm that the sales representative actually contacted them on a particular date.  Batura described Pfizer's policy regarding such audits

in an email addressing the investigation of Marjorie Wagoner,[1] another Pfizer

employee.  The email reads:

> Depending on the situation, we conduct physician signature audits in either of two ways.
>
> In cases where 'form banking' or the falsification of dates and/or signatures is suspected, we conduct "longitudinal" audits, which entail the selection of 6-8 forms for between 10 and 15 medical practitioners. . . .
>
> In cases where there's more generalized "concern," but little in the way of circumstantial evidence that suggests wrong-doing, we'll randomly select 25+ of a representative's more recently submitted forms . . . .
>
> Based on Marj Wagoner's sampling patterns, it might be worthwhile to try the latter [random] approach first, if only to be able to survey large numbers of the practitioners with whom she's left starters.  In my experience, most survey respondents base their replies on the perceived authenticity of their signatures and whether they believe the recorded quantities to be realistic—rather than on the form dates.

Indeed, Pfizer seldom used longitudinal audits: neither Chaudhari, nor her

supervisor, Cheryl James, had ever been involved in one and Batura estimated

such audits were employed in only 15% of the starter-form investigations.

---

[1] Wagoner brought similar claims against Pfizer, and many of the facts of her case are identical to Kirkpatrick's.  After Pfizer reorganized its sales force, Wagoner was similarly asked by her new district manager, Clark Mohar, about her retirement plans.  In addition, her district manager told her that she had an "adult learning style" and "needed a lot of repetition."  Like Kirkpatrick, she was also summoned to meet with Chaudhari in Chicago, and was accused of changing the date on starter forms to balance out her daily sales activity.  Wagoner was terminated on July 14, 2006, just one month prior to Kirkpatrick's termination.  At the time of her termination, Wagoner was fifty-six years old.

-7-

In light of the inconsistencies in Kirkpatrick's starter forms, McAllister informed Tim George, Vice President of Sales, of his intention to bring Kirkpatrick in for an investigative meeting. George agreed with this decision, and told McAllister that if Kirkpatrick did not have a plausible explanation for the apparent falsification of starter forms, he would recommend discharge "even in the absence of her admitting it." On July 20, 2006, Pfizer conducted an investigative meeting with Kirkpatrick regarding her starter activity. This meeting was held in Chicago, the location of Pfizer's regional office; Chaudhari, McAllister, and Holt were in attendance. At this meeting, Kirkpatrick was repeatedly accused of changing the dates on her starter forms. The meeting was very upsetting to Kirkpatrick, who was understandably shaken by the accusations. She began crying, and twice became physically ill. According to Kirkpatrick, at no point during the four-hour meeting did she admit to falsifying her starter forms. After the July 20 meeting, both Chaudhari and her supervisor, James, continued to investigate Kirkpatrick's starter-form practices. These investigations provided additional evidence that Kirkpatrick was not following the required call cycle, and that Kirkpatrick completed fewer starter forms than her teammate, Meredith Edwards.

On August 21, 2006, Kirkpatrick was terminated based on the results of the investigation into her starter-administration practices. Pfizer's statement to the EEOC indicated the company "terminated Ms. Kirkpatrick's employment because

she admitted that she knowingly falsified company records regarding calls she claimed to have made on doctors' offices and starters (pharmaceutical product samples) that she left at those offices." The statement, however, also detailed the evidence of falsification Pfizer relied upon to support its decision to terminate Kirkpatrick, noted that "[f]alsification of [starter] forms is absolutely prohibited," and ultimately asserted Pfizer's decision to terminate Kirkpatrick therefore "clearly was a legitimate business decision." The day she was terminated, Kirkpatrick was told to meet Holt at a storage unit with her company credit card and company car keys. Kirkpatrick handed the credit card, which she had already cut into pieces, and car keys to Holt. Holt turned to Kirkpatrick, said "you're done," and drove away in the company car, leaving Kirkpatrick stranded more than two miles from home.

More than a year after Kirkpatrick's termination, on April 1, 2008, Pfizer wrote a letter to the FDA accusing Kirkpatrick of admitting to falsifying her starter forms. The letter stated:

> In accordance with Section 503(d)(3)(D) of the Federal Food, Drug and Cosmetic Act, we are hereby writing to belatedly inform you of the admission by our now former representative, Karen M. Kirkpatrick, that, in order to report a more consistent number of physician calls per day, she changed the dates on certain of her sample receipts.

After her termination, Kirkpatrick obtained employment as a sales representative with Amylin Pharmaceutical. However, she alleged Pfizer's

conduct "completely changed [her] life," and that the intimidation, harassment, and humiliation she experienced at Pfizer was "worse than the loss of [her] first husband to cancer." In particular, her diverticulitis went from "completely manageable" to severe during the period after Pfizer reorganized its sales force. Indeed, she left her job at Amylin after one year because of the adverse impact of travel on her diverticulitis.

The evidence at trial, however, indicated there are no medical studies linking stress with diverticulitis. Further, Kirkpatrick's medical records did not support her description of the progression of her disease. For example, the notes from Kirkpatrick's doctor's appointment shortly before her termination at Pfizer indicated she suffered from intermittent diarrhea and lower abdominal pain. The next two visits, which occurred during her employment at Amylin, reflected Kirkpatrick was "feeling better," with "some intermittent pain." Notes from over one year after her termination from Pfizer indicated Kirkpatrick complained only of "constipation" from the "long hours of driving." The notes from 2004-2008 also indicate Kirkpatrick never rated her pain as higher than two on a scale of one to five, and colonoscopies performed in 1998 and 2007 indicate Kirkpatrick's diverticulitis actually improved during that time period.

Kirkpatrick filed the present lawsuit against Pfizer alleging violations of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621, and age discrimination and intentional infliction of emotional distress under Oklahoma

-10-

law.[2]  Pfizer moved for summary judgment on all of Kirkpatrick's claims.  The district court denied summary judgment on Kirkpatrick's age discrimination claims, concluding that "[w]hile the evidence in favor of Plaintiff is sparse, the Court cannot say that it is so one-sided as to entitle Defendant to judgment as a matter of law."  The district court granted summary judgment on Kirkpatrick's intentional infliction of emotional distress claim, concluding Kirkpatrick "failed to offer any evidence from which a reasonable juror could find that Defendant's actions were . . . so extreme and outrageous as to be beyond all possible bounds of decency," and that Kirkpatrick did not establish she suffered distress so extreme that "no reasonable person could be expected to endure it."

On May 11, 2009, the case proceeded to trial on the age discrimination claims.  After the conclusion of Kirkpatrick's case-in-chief on May 14, Pfizer moved under Rule 50 for the entry of judgment as a matter of law.  The district court granted Pfizer's motion in both an oral and written ruling.  The district court's written ruling explained Kirkpatrick had failed to present sufficient evidence from which a jury could conclude Kirkpatrick's age played a role in her

---

[2]Kirkpatrick initially joined her claims with those of Marjorie Wagoner, a similarly situated Pfizer employee, in the same lawsuit in the District of Kansas. The district court severed the two cases, stating the two terminations "were at different times, involved different individuals, and occurred at different locations."  Further, the district court held there was "no evidence" to support the allegation that Pfizer had engaged in "a common plan or scheme" with regard to Kirkpatrick and Wagoner.  The district court transferred Kirkpatrick's case to the Western District of Oklahoma, and neither Kirkpatrick nor Wagoner appealed from the order of severance and transfer.

termination.  First, it noted there was an entirely age-neutral explanation for Pfizer's conduct in investigating Kirkpatrick, including its failure to conduct a longitudinal audit.  Next, it held the age-related comments made by Holt "too temporally remote and too infrequent to permit a reasonable jury to find they are evidence of an intent to discriminate."  Finally, the district court concluded that, despite Kirkpatrick's assertions to the contrary, "there is absolutely no evidence Defendant did not have a good faith belief that forms had been falsified and that falsification required termination."  On appeal, Kirkpatrick argues the district court erred in dismissing her claims against Pfizer as a matter of law.

## III.    ANALYSIS

### A.    Age Discrimination Claims

The district court's decision granting judgment as a matter of law on Kirkpatrick's ADEA claim is reviewed de novo applying the same standard as the district court.  *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir. 2002). Judgment as a matter of law is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."  *EEOC v. Heartway* Corp., 466 F.3d 1156, 1160 (10th Cir. 2006) (quotation omitted).

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of

employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[3] ADEA

liability turns on whether age "actually motivated the employer's decision."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (holding a

plaintiff must show age "actually played a role in [the employer's decision-

making] process and had a determinative influence on the outcome" (quotation

omitted)). Once there has been "a full trial on the merits, . . . we are left with the

single overarching issue whether plaintiff adduced sufficient evidence to warrant

a jury's determination that adverse employment action was taken against the

plaintiff because of his or her protected status." *Kendrick v. Penske Transp.*

*Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (quotation omitted). Therefore,

the outcome of this appeal turns on whether Kirkpatrick presented sufficient

evidence from which a jury could conclude Pfizer's articulated reason for

terminating her was pretextual.

---

[3]In addition to her federal claim under the ADEA, Kirkpatrick brought a
state-law *Burk* claim based on the same conduct. *See Burk v. K-Mart Corp.*, 770
P.2d 24, 28 (Okla. 1989). Under *Burk*, an employer can be liable for discharging
an at-will employee if "'the discharge is contrary to a clear mandate of public
policy as articulated by constitutional, statutory, or decisional law.'" *Moore v.
City of Wynnewood*, 57 F.3d 924, 935 (10th Cir. 1995) (quoting *Burk*, 770 P.2d at
28). The district court, in granting Pfizer's motion for judgment as a matter of
law, did not include a separate discussion of Kirkpatrick's *Burk* claim. In
briefing this appeal, Kirkpatrick has not provided any argument indicating her
*Burk* claim survives the dismissal of her ADEA claim. Accordingly, our
discussion of Kirkpatrick's ADEA claim applies equally to her related *Burk*
claim.

In determining whether Kirkpatrick has met her burden, this court "examine[s] the facts as they appear to the person making the decision." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (quotation and emphasis omitted); *see also Kendrick*, 220 F.3d at 1231. A plaintiff typically makes a showing of pretext with evidence that: (1) defendant's stated reason for the adverse employment action is false, (2) defendant acted contrary to a written policy, or (3) defendant acted contrary to an unwritten policy or practice. *Kendrick*, 220 F.3d at 1230. However, pretext can also be shown "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (quotation omitted).

Kirkpatrick advances several arguments in an attempt to show Pfizer's proffered legitimate reason was pretextual. She argues the evidence presented at trial revealed ageist remarks made by her regional manager, Pfizer's "sham" investigation of her, Pfizer's disparate treatment of her, Pfizer's "false" reason for terminating her, and Pfizer's termination of Marjorie Wagoner, a similarly situated employee, was sufficient to allow the jury to reasonably infer Pfizer's proffered reason was pretextual. Each of Kirkpatrick's arguments fail.

### 1. Age-Related Comments

The evidence reveals that Kirkpatrick's supervisor, Holt, made three comments to Kirkpatrick after Pfizer's reorganization of its sales force. Holt told her he "didn't realize [she was] as old as [she] was," asked her about her retirement plans, and commented that her suggestions were "old school." These comments are insufficient to support a finding of pretext for several reasons.

First, "stray remarks," and "isolated or ambiguous comments are too abstract . . . to support a finding of age discrimination." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (quotations and alteration omitted); *see also Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) (holding supervisor's comments that "at [employee's] age, it would be difficult to train for another position" or "difficult to find a new job" were too abstract to support an inference of age discrimination). Holt's comment about not realizing Kirkpatrick's age, and his description of her suggestions as "old school" are the type of stray remarks that are too ambiguous to be evidence of age discrimination. Holt's final comment regarding Kirkpatrick's retirement plans also does not support age bias under the particular facts of this case. *See, e.g.*, *Ziegler v. Beverly Enters.-Minn., Inc.*, 133 F.3d 671, 676 n.3 (8th Cir. 1998) (holding an employer's questions about an employee's age and retirement plans insufficient to demonstrate age discrimination); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (same); *Colosi v. Electri-Flex Co.*, 965 F.2d 500,

502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.").

Furthermore, the passage of time can also render a comment too remote to support a finding of pretext. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (holding a comment made nine months before termination too remote to establish retaliatory motive). In the present case, Holt's comments regarding his impressions of Kirkpatrick's age were made ten months prior to Kirkpatrick's termination and are too remote to support a finding of pretext. As such, this comment, in addition to being ambiguous, was also too temporally remote to support a finding of pretext.

### 2. Pfizer's Investigation

Kirkpatrick alleges Pfizer's investigation of her starter forms was a "sham" because Pfizer did not conduct a longitudinal audit in contravention of its investigation practices. As noted, Kirkpatrick can establish pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons," *Mickelson*, 460 F.3d at 1315 (quotation omitted), and through evidence that Pfizer acted contrary to its own written and unwritten policies and practices, *Kendrick*, 220 F.3d at 1230. Kirkpatrick's evidence, however, fails to support a reasonable inference that Pfizer's investigation of her starter forms was pretextual in this regard.

-16-

First, Pfizer's investigation was triggered by uncontested deficiencies in Kirkpatrick's starter forms. Both Holt and Batura prepared reports indicating why they suspected Kirkpatrick of falsifying her starter forms. Batura's report showed Kirkpatrick was often late in entering her starter transactions into the electronic database and entered forms out of sequence. It also identified several starter forms on which Kirkpatrick appeared to have altered dates. Further investigation by Holt revealed additional discrepancies, including several instances where Kirkpatrick's restaurant receipts and toll pass records did not match the dates listed on Kirkpatrick's starter forms. Additional investigation by Chaudhari and her supervisor, James, also provided further evidence that Kirkpatrick was not following the call cycle imposed by Holt. In light of this uncontested evidence supporting the propriety of Pfizer's investigation, Kirkpatrick's conclusory allegation that Pfizer's investigation was a "sham" fails to reveal weaknesses or inconsistencies in Pfizer's proffered reason sufficient to allow a reasonable jury to conclude Pfizer's articulated reason is pretextual.

Pfizer's failure to conduct a longitudinal audit of Kirkpatrick's starter forms is similarly insufficient. In the present case, Kirkpatrick's argument is based on language from an email Batura wrote in connection with Pfizer's investigation of Marjorie Wagoner. That email, however, does not support Kirkpatrick's contention that Pfizer had a policy of conducting longitudinal audits whenever there was a suspicion of starter form falsification. Read in its entirety,

the email states that Pfizer conducts two types of audits, longitudinal and random, when investigating starter form falsification, and that in cases similar to this one, it is "worthwhile to try the latter [random] approach first, if only to be able to survey large numbers of the practitioners with whom [the sales representative has] left starters." The uncontested evidence revealed Pfizer rarely used longitudinal audits in conducting starter form investigations. Thus, the evidence produced at trial provided no basis for a jury to conclude Pfizer had a policy of conducting longitudinal audits or that it failed to follow any written or unwritten policy.

### 3.  Disparate Treatment

As noted, a plaintiff may also show pretext "by providing evidence that [she] was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. Trivial differences in treatment are insufficient to show pretext. *See id.*; *see also Doan v. Seagate Tech. Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) (holding plaintiff's "[s]peculation . . . will not suffice for evidence"); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (holding mere conjecture insufficient to support an allegation of pretext).

Kirkpatrick argues Pfizer failed to investigate other sale representatives who made similar errors on their starter forms. Kirkpatrick testified she "felt" Pfizer was more lenient towards younger representatives. She also testified Holt used a "harsher tone" with her than with Meredith Edwards, a younger employee.

These alleged differences in treatment are insufficient for a reasonable jury to conclude Pfizer's articulated reason is pretextual because they are based solely upon Kirkpatrick's mere speculation. Kirkpatrick's additional assertion that Pfizer did not investigate her younger replacement Rachel Hyde's starter activity, even if correct, similarly does not show disparate treatment because Kirkpatrick has failed to demonstrate this disparate treatment, if any, was caused by age bias and not based upon the other circumstances which distinguished Hyde's case from Kirkpatrick's.[4]

### 4. False Reason

Kirkpatrick also contends Pfizer's only stated reason for terminating her was her admission at the Chicago investigative meeting that she falsified her starter forms. She argues she presented sufficient evidence from which a jury could conclude this reason was fabricated by Pfizer. As noted, evidence that a defendant's stated reason is false can support a finding of pretext. *Kendrick*, 220 F.3d at 1230. In determining whether the proffered reason for a decision was false, this court "examine[s] the facts as they appear to the person making the decision." *Zamora*, 478 F.3d at 1166 (quotation and emphasis omitted). "The

---

[4]Kirkpatrick's argument rests on her assertion that "[changes to dates on Hyde's starter forms] were the exact same type of inconsistencies that [Pfizer] alleged to be 'falsification' in Kirkpatrick's case." There is no evidence there were any other similarities between the two; for example, there is no evidence her replacement's name appeared on a No Starter Activity Report, failed to follow her mandatory call cycle, submitted inconsistent receipts, or failed to be in the field during mandatory work hours.

relevant inquiry is not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotation omitted).

Kirkpatrick argues Pfizer's statement to the EEOC, which stated Pfizer "terminated Ms. Kirkpatrick's employment because she admitted that she knowingly falsified company records regarding calls she claimed to have made on doctors' offices and starters (pharmaceutical product samples) that she left at those offices." The remainder of the statement detailed the evidence of falsification Pfizer relied upon to support its decision to terminate Kirkpatrick, noted that "[f]alsification of [starter] forms is absolutely prohibited," and ultimately concluded Pfizer's decision to terminate Kirkpatrick therefore "clearly was a legitimate business decision." Further, Pfizer produced evidence that independently established Kirkpatrick's falsification of starter forms and showed Pfizer had a good faith reason to terminate her, regardless of whether she admitted to any wrongdoing at the Chicago meeting. Accordingly, Kirkpatrick has not put forth sufficient evidence from which a reasonable jury could conclude Pfizer's proffered reason for terminating her was false.

### 5.    Pfizer's Termination of Marjorie Wagoner

Marjorie Wagoner's termination does not support Kirkpatrick's claim. There is no evidence to support Kirkpatrick's assertion that Pfizer acted against

her and Wagoner as part of an orchestrated scheme. The district court in the Wagoner case granted summary judgment in favor of Pfizer on all of Wagoner's claims, and that decision has been affirmed by this court. *See Wagoner v. Pfizer*, No. 09-3066, slip op. at 23 (10th Cir. Aug.12, 2010). The difference in procedural posture between the two cases is of no moment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (stating the standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)"). Just as Wagoner's evidence of pretext failed to create an issue of triable fact in her case, it is also insufficient to show pretext in this case. In sum, all of the evidence, taken together and viewed in the light most favorable to Kirkpatrick, demonstrates that no reasonable jury could conclude Pfizer's proffered reason for terminating her was pretextual. Accordingly, the district court's directed verdict in Pfizer's favor on Kirkpatrick's age discrimination claim is appropriate.

### B. Outrage Claim

The district court's decision granting summary judgment on Kirkpatrick's outrage claim is reviewed de novo. *Clear One Commc'ns v. Nat'l Union Fire Ins. Co.*, 494 F.3d 1238, 1243 (10th Cir. 2007). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). In

conducting this review, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

To succeed on a claim of outrage under Oklahoma law, a plaintiff must show: (1) the defendant's conduct was intentional or reckless, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused the plaintiff to suffer emotional distress, and (4) the plaintiff's emotional distress was severe. *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991). To satisfy the extreme and outrageous element, a plaintiff must prove the defendant's conduct was so extreme and outrageous as to be beyond all possible bounds of decency. *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) ("Conduct which, though unreasonable, is neither beyond all possible bounds of decency in the setting in which it occurred, nor is one that can be regarded as utterly intolerable in a civilized community, falls short of having actionable quality." (quotations omitted)). In evaluating the outrageousness of certain conduct, courts must consider the setting in which the conduct occurred. *Id.* In the workplace setting, this allows "employers some latitude in investigating possible employee misconduct." *Daemi*, 931 F.2d at 1388 n.8. Further, Oklahoma law explicitly does not extend liability "to mere insults, indignities, threats, . . . [or] occasional acts that are definitely inconsiderate and unkind." *Eddy*, 715 P.2d at 77 (quotation omitted). Finally, Oklahoma law also directs the district court to act as

-22-

a gatekeeper and make an initial determination about the validity of a claim before sending it to the jury. *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1377-78 (Okla. 1978) ("The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded so extreme and outrageous as to permit recovery . . . .").

Kirkpatrick argues evidence of a defendant's "sustained, persistent, and orchestrated campaign to embarrass and humiliate" a plaintiff is sufficient to establish a claim of outrage under Oklahoma law. Kirkpatrick cites no Oklahoma law in support of this proposition. Rather, she relies entirely on this court's decisions in *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1559 n.7 (10th Cir. 1995), and *Snider v. Circle K Corp.*, 923 F.2d 1404, 1408-09 (10th Cir. 1991). In *Starr*, this court affirmed summary judgment against an employee on an outrage claim even though the facts revealed the employer had yelled at, touched, and briefly obstructed the employee from leaving a meeting. *Id.* at 1559. In rejecting the plaintiff's claim, the court dismissed the plaintiff's reliance on *Snider*, concluding *Snider* was both procedurally and factually distinguishable. *Starr*, 54 F.3d at 1559 n.7. In a footnote, the *Starr* decision observed:

> When viewed in the context of its procedural posture, however, *Snider* does not dictate judgment in favor of Starr. In *Snider*, the district court submitted the plaintiff's intentional infliction of emotional distress claim to the jury, which ruled in her favor. Defendants appealed, following an adverse jury verdict, claiming there was insufficient evidence at trial to have submitted that issue to the jury. We reviewed that ruling under an abuse of discretion

-23-

> standard. The evidence there revealed a sustained, persistent and orchestrated campaign to embarrass and humiliate the plaintiff which is quite unlike the episodic nature of the events involving Jacqui Starr.

*Id.* This footnote should not be read to support Kirkpatrick's theory that an outrage claim under Oklahoma law can be supported by only showing "a sustained, persistent, and orchestrated campaign to embarrass and humiliate." *Id.* This is especially true given *Snider* did not involve a de novo review of the sufficiency of the evidence. Rather, as noted above, to be actionable under Oklahoma law, a defendant's conduct must be so extreme and outrageous as to be beyond all possible bounds of decency. *Eddy*, 715 P.2d at 77.

In the present case, Kirkpatrick failed to offer any evidence from which a reasonable juror could find that Pfizer's actions were so extreme and outrageous as to meet this high standard. Kirkpatrick argues Holt's conduct, combined with her treatment at the investigative meeting in Chicago, were sufficient to establish outrage. Specifically, she highlights the age-related comments Holt made to her, his imposition of a schedule on her that hindered her performance, and the constant pressure Holt directed toward her after Pfizer's reorganization of its sales force. Further, she emphasizes the Chicago meeting comprised four hours of intense interrogation, accusation, and rapid-fire questioning which she found physically and emotionally distressing. Finally, she claims Pfizer's conduct after her termination, the manner in which her credit card and company car were

retrieved, and Pfizer's reporting of her starter falsification to the FDA, provide further support for her outrage claim. Even considered in the light most favorable to Kirkpatrick, this evidence is not sufficient to support an outrage claim under Oklahoma law. Accordingly, the district court was correct in granting Pfizer's motion for summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Pfizer on Kirkpatrick's outrage claim and its grant of judgment as a matter of law on her age discrimination claim are **AFFIRMED**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge