**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 12, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARJORIE WAGONER,

        Plaintiff-Appellant,

v.

PFIZER, INC.,

        Defendant-Appellee.

No. 09-3066

(D. Kansas)

(D.C. No. 6:07-CV-01229-EFM)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

## I.    INTRODUCTION

Marjorie Wagoner filed this lawsuit against Pfizer, Inc., her former employer, alleging various violations of the Age Discrimination in Employment Act ("ADEA") and Kansas law. The district court granted Pfizer's motion for summary judgment on all of Wagoner's claims, concluding Wagoner had failed to present evidence her termination was age related. It also concluded Pfizer's conduct was not sufficiently extreme and outrageous to support an outrage claim

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

under Kansas law.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **AFFIRMS**.

## II.    BACKGROUND

Wagoner began working for Pfizer as a pharmaceutical sales representative in 1980.  On July 14, 2006, after working at Pfizer for twenty-six years, Wagoner was terminated for falsifying prescription drug starter forms.  At the time of her termination, Wagoner was fifty-six-years old.

As a sales representative, Wagoner routinely called on physicians, hospitals, and other healthcare providers and explained the benefits of Pfizer's pharmaceutical products, thereby generating sales of prescription medications. The marketing and distribution of prescription drugs is regulated by the United States Food and Drug Administration ("FDA") and is subject to the Prescription Drug Marketing Act ("PDMA").  Pfizer's sales representatives distribute samples of Pfizer's products, called "starters," to allow doctors to start patients on a course of therapy with the drug.  Whenever a sales representative gives a starter to a doctor, the representative is required by Pfizer policy and the PDMA to complete a "starter form."  The starter forms must be completed by the sales representative, and signed by both the doctor and the sales representative.

Pfizer must make all starter forms available to the FDA and must also report any intentional misstatement on a starter form to the FDA.  "Banking" starter forms (re-dating them to create the impression of regular sales activity) or

-2-

otherwise falsifying starter forms in any way is both a federal crime and a violation of Pfizer's policies. Pfizer's policies require sales representatives to input their starter transactions on a daily basis into an electronic database, which Pfizer uses to oversee starter activity.

In September 2005, Pfizer's sales force underwent a nationwide reorganization. As a result, a large portion of the sales force across the country obtained new managers and/or were given new sales territories. Prior to this reorganization, Clark Mohar, a Pfizer manager, told Wagoner he preferred to "hire his own reps" and communicated to Wagoner he did not want older sales representatives under his management. As a result of the reorganization, Mohar became Wagoner's district manager and JoAnn Yeksigian became Wagoner's regional manager. During the first meeting after the reorganization, Mohar publicly asked Wagoner when she intended to retire. After accompanying Wagoner on a field ride, Mohar stated, "[t]he best part of the day is that it's over" and told Wagoner she had an "adult learning style." When Wagoner asked Mohar what that meant, he told Wagoner it was because she "needed a lot of repetition." Mohar also undermined Wagoner in front of her sales contacts, and provided little, if any, notice prior to riding with her on at least four occasions in early 2006. Wagoner alleges Mohar did not treat any of the younger sales representatives in a similar fashion.

In early 2006, Wagoner submitted a hotel receipt on which she obscured the check-in and check-out times. When Mohar questioned Wagoner about her failure to submit the original receipt, she told him she would look for it, but ultimately never provided one. When Mohar obtained an unredacted copy of the receipt from the hotel, he noticed Wagoner had checked-in and checked-out during the early afternoon on succeeding days, in violation of Pfizer's policy which requires sales representatives to be working in the field between 8:00 a.m. and 5:00 p.m.

Pfizer alleges Wagoner's name also appeared on several "No Starter Activity Reports" in 2006. These weekly reports identify all sales representatives in the region who have not reported any starter transactions with any physicians for at least a week. Yeksigian, Wagoner's regional manager, reviewed these reports and notified Mohar. Mohar notified Yeksigian that Wagoner was not on vacation or otherwise out of her sales territory, and also informed her about Wagoner's falsification of the hotel receipt.

Yeksigian then asked Larry Guess, the assistant to the regional manager, to prepare a preliminary summary of Wagoner's recent starter activity. The review revealed Wagoner appeared to have misdated some forms and written over and changed the dates on others, and that Wagoner often entered her starter forms out of sequential order. Yeksigian contacted Elizabeth Chaudhari, a manager in Pfizer's Human Resources Department in the Chicago regional office, and Jim

Batura, Team Leader in Starter Operations, to further investigate Wagoner's starter activity. Batura prepared a report indicating that dates on several of Wagoner's starter forms "appear[ed] to have been overwritten" and that 273 out of 644 starter transactions were out of sequential order. Batura noted these findings "appear[ed] to suggest" that Wagoner had "banked" her starter forms.

Batura recommended he conduct a random physician signature audit of Wagoner's starter forms. In an email to Yeksigian, he stated:

> Depending on the situation, we conduct physician signature audits in either of two ways.
>
> In cases where 'form banking' or the falsification of dates and/or signatures is suspected, we conduct "longitudinal" audits, which entail the selection of 6-8 forms for between 10 and 15 medical practitioners. . . .
>
> In cases where there's more generalized "concern," but little in the way of circumstantial evidence that suggests wrong-doing, we'll randomly select 25+ of a representative's more recently submitted forms . . . .
>
> Based on Marj Wagoner's sampling patterns, it might be worthwhile to try the latter [random] approach first, if only to be able to survey large numbers of the practitioners with whom she's left starters. In my experience, most survey respondents base their replies on the perceived authenticity of their signatures and whether they believe the recorded quantities to be realistic—rather than on the form dates.

Batura's audit indicated that diversion of samples was not a primary concern. Because the audit did not resolve the issue of the accuracy of the dates on the starter forms, Chaudhari and Yeksigian arranged to meet with Wagoner at the regional office in Chicago.

-5-

Yeksigian, Mohar, Chaudhari, and Guess met with Wagoner on June 29, 2006, in the Chicago office to discuss the concerns raised by the hotel receipt and her starter activity. Yeksigian and Chaudhari interrogated Wagoner regarding her starter administration practices and habits. Four starter forms were discussed during the Chicago meeting, but they were projected on a screen and were not easily legible. Wagoner described this interrogation as "rapid fire" and a "witch hunt," and felt "berate[d] . . . with false accusations that [she] had changed the date on certain drug sample starter forms to balance [her] daily sales activities." Wagoner tried to explain the discrepancies found in her starter forms, but was repeatedly cut off and told that she was "lying." She further attested:

> the meeting was intense and relentless, and at one point I said, I have to take a break because my temperature is rising because people were asking questions. I didn't know the appropriateness of it. I wasn't a part of—I wasn't getting it at that point. And we took a break, and I went to the bathroom, and I was not well. It was—I had not been treated so rudely in my life . . . .

The meeting lasted four hours, and left Wagoner "physically shaken."

On the same day as the investigatory meeting, Chaudhari sent an email to Batura, informing him that Wagoner had "admitted to altering the doctors' dates on starter forms to spread her sales calls across days." Batura informed Chaudhari he would follow the standard FDA reporting process, and in turn sent a letter to the FDA's Office of Compliance, in which he reported Wagoner's admission.

On July 14, 2006, Mohar and Cheryl James, a team leader in Human Resources, telephoned Wagoner to inform her that "she was being terminated for falsifying starter forms" which "was a violation of the PDMA and Pfizer policy." According to Pfizer's statement to the EEOC, Wagoner "was terminated for admitting to falsifying documentation by changing dates on starter forms in an effort to balance her work activity." The next three pages of the statement, however, detail the evidence of falsification Pfizer relied upon to support its decision, and conclude that "[t]he evidence clearly demonstrates that Ms. Wagoner was terminated for falsifying Company documentation." Yeksigian also testified at a deposition that Wagoner's alleged admission was the "only reason she was terminated." Wagoner, however, adamantly denied falsifying the dates on her forms, insisted she would only overwrite the date on a form if the doctor wrote the incorrect date, and denied admitting any wrongdoing at the Chicago meeting. Wagoner performed her own analysis of her starter forms, in which she investigated the eighteen starter forms Pfizer claims she falsified, and verified that the dates and signatures on those forms were accurate.

The events leading up to her termination at Pfizer left Wagoner in a state of "major depression" and "acute situational anxiety." Her health care providers stated Wagoner found it very difficult to deal with the loss of her job. She has experienced significantly lower levels of happiness and pleasure in her life, loss

of self-esteem, increased anxiety and eating, increased alcohol intake, insomnia, and a general desire to be isolated.

The evidence revealed Pfizer also terminated another sales representative, Karen Kirkpatrick, after reorganizing its sales force in 2005. Kirkpatrick was fifty-five years old and also terminated for allegedly "admitting to falsifying documentation by changing dates on starter forms in an effort to balance her work activity." Like Wagoner, Kirkpatrick was also asked by her regional manager regarding her retirement plans, summoned to Chicago for an investigative meeting, and eventually terminated.

Wagoner filed the present lawsuit against Pfizer alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and intentional infliction of emotional distress under Kansas law.[1] Pfizer moved for summary judgment on all of Wagoner's claims, which the district court granted. The district court determined Wagoner had established a prima facie case, and that Pfizer had proffered a legitimate, non-discriminatory reason for terminating

---

[1]Wagoner initially joined her claims with those of Karen Kirkpatrick, a similarly situated Pfizer employee, in the same lawsuit in the District of Kansas. The district court severed the two cases, stating the two terminations "were at different times, involved different individuals, and occurred at different locations." Further, the district court held there was no evidence to support the allegation that Pfizer had engaged in a common plan or scheme with regard to Kirkpatrick and Wagoner. The district court transferred Kirkpatrick's case to the Western District of Oklahoma, and neither Kirkpatrick nor Wagoner have challenged the severance and transfer.

-8-

Wagoner, namely that she had violated Pfizer's policies regarding the distribution of pharmaceutical drugs. The district court then rejected each of Wagoner's arguments that Pfizer's articulated reason for terminating Wagoner was a pretext for age discrimination, and therefore granted Pfizer's summary judgment motion on the claim. As to Wagoner's intentional infliction of emotional distress claim, the district court concluded Wagoner had failed to present evidence of extreme or outrageous behavior or a sustained, persistent and orchestrated campaign to embarrass and humiliate her, and therefore granted summary judgment in Pfizer's favor on this claim as well.

## III.  ANALYSIS

### A.  Standard of Review

This court reviews a grant of summary judgment de novo, employing the same legal standard as the district court. *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1047 (10th Cir. 2004). Under this standard, summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). In conducting this review, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

**B.     Age Discrimination Claim**

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  ADEA liability turns on whether age "actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (holding a plaintiff must show age "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome" (quotation omitted)).  In a case such as this one, when a plaintiff presents only circumstantial evidence of her employer's discriminatory motive, this court uses the *McDonnell Douglas* burden-shifting analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1165-69 (10th Cir. 2000) (applying *McDonnell Douglas* framework to an ADEA claim).

To survive summary judgment under *McDonnell Douglas*, Wagoner must first establish a prima facie case by showing: (1) she belonged to a protected class, (2) she was qualified for the position and performed it satisfactorily, (3) she was discharged, and (4) the position was not eliminated after her discharge.  411 U.S. at 802; *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226-29 (10th Cir. 2000).  If Wagoner successfully makes this showing, Pfizer must

-10-

articulate a legitimate, nondiscriminatory reason for the termination. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The burden then shifts back to Wagoner to demonstrate there is a genuine issue of material fact as to whether the proffered reason is pretextual. *Id.* In the present case, the district court concluded Wagoner established a prima facie case and Pfizer articulated a non-discriminatory reason for her discharge. Neither party challenges these decisions on appeal. Therefore, the outcome of this appeal turns on whether there is a genuine issue of material fact as to pretext.

In determining whether pretext exists, this court "examine[s] the facts as they appear to the person making the decision." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (quotation and emphasis omitted); *see also Kendrick*, 220 F.3d at 1231. A plaintiff typically makes a showing of pretext with evidence that: (1) defendant's stated reason for the adverse employment action is false, (2) defendant acted contrary to a written policy, or (3) defendant acted contrary to an unwritten policy or practice. *Kendrick*, 220 F.3d at 1230. However, pretext can also be shown "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (quotation omitted).

Wagoner advances several arguments in an attempt to show Pfizer's proffered legitimate reason was pretextual. She argues the ageist remarks made by her regional manager, Pfizer's sham investigation of her, Pfizer's failure to treat her as favorably as younger sales representatives, Pfizer's "false" reason for terminating her, and Pfizer's termination of Karen Kirkpatrick, a similarly situated employee, all created issues of material fact as to whether Pfizer's proffered reason was pretextual. Each of Wagoner's arguments fail.

### 1. Age-Related Comments

Wagoner contends her supervisor, Mohar, made several age-related comments to her, and that these comments create a triable issue of fact as to pretext. Specifically, Wagoner alleges Mohar stated he preferred to "hire his own reps" and that he did not want older sales representatives under his management. He also asked Wagoner when she intended to retire, and told Wagoner she had an "adult learning style" which required "a lot of repetition." These comments are insufficient to support a finding of pretext for several reasons.

First, even at the summary judgment stage, "stray remarks," and "isolated or ambiguous comments are too abstract . . . to support a finding of age discrimination." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (quotations and alteration omitted); *see also Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) (holding supervisor's comments that "at [employee's] age, it would be difficult to train for another position" or "difficult

-12-

to find a new job" were too abstract to support an inference of age discrimination). In the present case, Mohar's comments regarding his impressions of Wagoner's learning style and hiring preferences were similarly too abstract to support a finding of pretext. Further, his inquiry as to Wagoner's retirement plans does not support age bias under the particular facts of this case. *See, e.g.*, *Ziegler v. Beverly Enters.-Minn., Inc.*, 133 F.3d 671, 676 n.3 (8th Cir. 1998) (holding an employer's questions about an employee's age and retirement plans insufficient to demonstrate age discrimination); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (same); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.").

Furthermore, the passage of time can also render a comment too remote to support a finding of pretext. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (holding a comment made nine months before termination too remote to establish retaliatory motive). In the present case, both of Mohar's comments about Wagoner's learning style and her retirement plans were made in September 2005, approximately nine months before Wagoner was terminated. As such, in addition to being ambiguous, they were also too temporally remote to support a finding of pretext under the facts of this case.

Finally, Mohar's comments also do not support a finding of pretext because he was not the one who made the decision to terminate Wagoner's employment. Age-related comments "by non-decisionmakers are not material in showing the [employer's] action was based on age discrimination." *Cone*, 14 F.3d at 531. There is no evidence indicating Mohar was the person who decided to terminate Wagoner's employment because of Wagoner's starter form violations. Rather, the evidence shows that Yeksigian, and Amy Jenner, Pfizer's Vice President of Sales, were the ones who decided to terminate Wagoner's employment. Accordingly, the district court correctly concluded that Wagoner "presented no evidence that any alleged age-bias on the part of Mohar influenced Yeksigian and Jenner."

### 2. Pfizer's Investigation

Wagoner alleges Pfizer's investigation of her starter forms was a "sham," because the "No Starter Activity" report that triggered the investigation was never produced by Pfizer, and because Pfizer did not conduct a longitudinal audit in contravention of its investigation practices. As noted, Wagoner can establish pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons," *Mickelson*, 460 F.3d at 1315 (quotation omitted), and through evidence that Pfizer acted contrary to its own written or unwritten policies and practices, *Kendrick*, 220 F.3d at 1230. Wagoner's evidence, however, fails to create a triable issue as to whether Pfizer's investigation of her starter forms was pretextual.

-14-

First, Pfizer's failure to produce the initial No Starter Activity Report does not render Pfizer's proffered reason for firing Wagoner false. The No Starter Activity Report did not form the basis for Wagoner's termination. Investigations of Wagoner's starter forms by Guess and Batura revealed discrepancies in her starter forms which indicated Wagoner was possibly banking her starter forms. Furthermore, Wagoner's hotel receipts also indicated she was not spending time in the field as required by Pfizer policy. In light of this uncontested evidence supporting the propriety of Pfizer's investigation, Wagoner's conclusory allegation that Pfizer's investigation was a "sham" does not create a triable issue that Pfizer's proffered reason for terminating her was false.

In addition, Pfizer's failure to conduct a longitudinal audit of Wagoner's starter forms is similarly insufficient to create a triable issue as to pretext. Wagoner's argument rests entirely on language from an email Batura wrote in connection with Pfizer's investigation of her. That email, however, does not support Wagoner's contention that Pfizer had a policy of conducting longitudinal audits whenever there was a suspicion of starter-form falsification. Read in its entirety, the email states Pfizer conducts two types of audits, longitudinal and random, when investigating starter-form falsification, and that in cases such as Wagoner's, it is "worthwhile to try the latter [random] approach first, if only to be able to survey large numbers of the practitioners with whom [the sales representative has] left starters." The uncontested evidence revealed Pfizer rarely

used longitudinal audits in conducting starter-form investigations. In sum, none of the evidence presented regarding Pfizer's investigation of Wagoner was sufficient to create a triable issue as to whether Pfizer's proffered reason for terminating her was pretext for age discrimination.

### 3. Disparate Treatment

A plaintiff may show pretext "by providing evidence that [she] was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. Trivial differences in treatment are insufficient to show pretext. *See id.* In addition, a plaintiff's mere speculation of differential treatment is also insufficient; rather a plaintiff must produce "specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (holding mere conjecture insufficient to support an allegation of pretext); *see also Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) (holding plaintiff's "[s]peculation . . . will not suffice for evidence").

Wagoner argues Mohar deliberately undermined her performance and humiliated her, and that there is no evidence that defendant treated younger sales representatives in the same contemptuous manner. Further, she argues Mohar gave her less notice of field rides than he gave younger sales representatives. First, Wagoner bears the burden of proving pretext; accordingly, she must come

-16-

forward with specific evidence of disparate treatment, not simply allege a lack of evidence that others were treated in the same manner. Wagoner presented no evidence that Mohar treated her any differently than younger sales representatives, and that this different treatment was due to age discrimination. Even if Wagoner's speculation regarding advance notice of field rides were true, such difference in treatment is trivial and therefore does not evidence pretext. *Kendrick*, 220 F.3d at 1232.

### 4. False Reason

Wagoner also contends Pfizer's only stated reason for terminating her was her admission at the Chicago investigative meeting. As noted, evidence that a defendant's stated reason is false can support a finding of pretext. *Kendrick*, 220 F.3d at 1230. In determining whether the proffered reason for a decision was false, this court "examine[s] the facts as they appear to the person making the decision." *Zamora*, 478 F.3d at 1166 (quotation and emphasis omitted). "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotation omitted).

Wagoner argues Pfizer's statement to the EEOC, which stated that Wagoner "was terminated for admitting to falsifying documentation by changing dates on starter forms in an effort to balance her work activity," coupled with her repeated

-17-

denial of admitting to any wrongdoing at the Chicago meeting, creates a triable issue as to whether Pfizer's reason was false. The next three pages of the statement, however, detail the evidence of falsification Pfizer relied upon to support its decision, and conclude that "[t]he evidence clearly demonstrates that Ms. Wagoner was terminated for falsifying Company documentation." Pfizer produced evidence that independently established Wagoner's falsification of starter forms and showed Pfizer had a good faith reason to terminate Wagoner, regardless of whether she admitted to any wrongdoing at the Chicago meeting. Accordingly, Wagoner has not put forth sufficient evidence to create a genuine issue of material fact as to pretext.

### 5. Pfizer's Termination of Karen Kirkpatrick

Karen Kirkpatrick's termination does not support Wagoner's claim. There is no evidence to support Wagoner's assertion that Pfizer acted against her and Kirkpatrick as part of an orchestrated scheme. The district court in the Kirkpatrick case granted judgment as a matter of law in favor of Pfizer on all of Kirkpatrick's claims, and that decision has been affirmed by this court. *See Kirkpatrick v. Pfizer*, No. 09-6116, slip op. at 25 (10th Cir. Aug.12, 2010). The difference in procedural posture between the two cases is of no moment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (stating the standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)"). Just as Kirkpatrick's evidence of pretext

-18-

failed to create an issue of triable fact in her case, it also fails to create a triable issue as to pretext in this case. In sum, all of the evidence, taken together and viewed in the light most favorable to Wagoner, demonstrates that no reasonable jury could conclude Pfizer's proffered reason for terminating Wagoner was pretextual. Accordingly, summary judgment in Pfizer's favor on Wagoner's age discrimination claim is appropriate.

### C. Outrage Claim

Under Kansas law, to establish a claim for outrage a plaintiff must demonstrate the defendant's conduct was intentional or in reckless disregard of the plaintiff, extreme and outrageous, and causally connected to the plaintiff's extreme and severe emotional distress. *Bolden v. PRC, Inc.*, 43 F.3d 545, 553 (10th Cir. 1994); *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991). Under Kansas law, the court must first determine whether the defendant's conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery." *Bolden*, 43 F.3d at 553. This requirement is only met if the conduct is "outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.* at 554 (quotation omitted). As a result, it is well-settled that "liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities." *Taiwo*, 822 P.2d at 1029 (quotation omitted).

Wagoner argues evidence of a defendant's "sustained, persistent, and orchestrated campaign to embarrass and humiliate" a plaintiff is sufficient to establish a claim of outrage under Kansas law. Wagoner cites no Kansas law in support of this proposition. Rather, she relies entirely on this court's decisions in *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1559 n.7 (10th Cir. 1995), and *Snider v. Circle K Corp.*, 923 F.2d 1404, 1408-09 (10th Cir. 1991). In *Starr*, this court affirmed summary judgment against an employee on an outrage claim even though the facts revealed the employer had yelled at, touched, and briefly obstructed the employee from leaving a meeting. *Id.* at 1559. In rejecting the plaintiff's claim, the court dismissed the plaintiff's reliance on *Snider*, concluding *Snider* was both procedurally and factually distinguishable. *Starr*, 54 F.3d at 1559 n.7. In a footnote, the *Starr* decision observed:

> When viewed in the context of its procedural posture, however, *Snider* does not dictate judgment in favor of Starr. In *Snider*, the district court submitted the plaintiff's intentional infliction of emotional distress claim to the jury, which ruled in her favor. Defendants appealed, following an adverse jury verdict, claiming there was insufficient evidence at trial to have submitted that issue to the jury. We reviewed that ruling under an abuse of discretion standard. The evidence there revealed a sustained, persistent and orchestrated campaign to embarrass and humiliate the plaintiff which is quite unlike the episodic nature of the events involving Jacqui Starr.

*Id.* This footnote should not be read to support Wagoner's theory that an outrage claim under Kansas law can be supported by only showing "a sustained, persistent, and orchestrated campaign to embarrass and humiliate." *Id.* This is

-20-

especially true given *Snider* did not involve a de novo review of the sufficiency of the evidence. Rather, as noted above, to be actionable under Kansas law, a defendant's conduct must be "outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Bolden*, 43 F.3d at 553.

Wagoner's attempts to meet this high standard with evidence of the two comments made by Mohar in September 2005; three incidents of allegedly differential treatment, the confrontational tenor of the Chicago meeting, and Pfizer's self-report to the FDA regarding Wagoner's conduct. The district court correctly held, as a matter of law, that Pfizer's conduct was not sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim under Kansas law.

Looking at the evidence in the light most favorable to Wagoner, this court concludes she has not presented sufficient evidence of extreme or outrageous behavior to support an outrage claim. Mohar's remarks about Wagoner's learning style and his queries about her retirement plans, are, at worst, the type of "mere insults" and "petty expressions" that do not rise to the level of outrageous conduct. *Taiwo*, 822 P.2d at 1029 (quotation omitted). Further, Pfizer's continued investigation of Wagoner was not a "sham"; rather, it was based in part on her falsification of hotel receipts which she herself admits exhibited "very poor judgment" on her part. Finally, Wagoner's treatment at the four hour

-21-

meeting in Chicago, and its subsequent reporting to the FDA, was similarly not so egregious as to support an outrage claim.

As to Pfizer's FDA reports, Wagner argues *Taiwo* supports the proposition that any allegedly false reporting by an employer satisfies the outrageousness requirement under Kansas law. But the outrageousness of the conduct alleged in *Taiwo* exceeds the conduct at issue here by several orders of magnitude, thus easily distinguishing that case. The uncontested evidence in *Taiwo* was that the defendant intentionally and maliciously "assaulted, battered, and falsely imprisoned" the plaintiff; lied to law enforcement officers in accusing the plaintiff of vandalism (an accusation both the defendant and the officers knew was false); filed a false police report based on the same false accusation; and induced an employee to lie to the police after the defendant was confronted with the falsehood. 822 P.2d 1029-30. Unlike the uncontestedly false reporting at issue in *Taiwo*, Pfizer presented evidence that it honestly believed Plaintiff had falsified dates on her starter forms to spread out her work activity. Further, Pfizer was required to report any instances of such falsification to the FDA. Wagoner has presented no evidence, other than her own denials of any wrongdoing, that demonstrates Pfizer intentionally lied to the FDA. Accordingly, the district court's grant of summary judgment in Pfizer's favor on this claim was therefore correct.

## IV.  CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Pfizer on both Wagoner's outrage and age discrimination claims is **AFFIRMED**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge