# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued:  March 2, 2015          Decided: July 7, 2016)

Docket No. 14-181-cv

_____

RITA WALSH,

*Plaintiff-Appellant*,

- v. -

NEW YORK CITY HOUSING AUTHORITY,

*Defendant-Appellee*.

_____

Before:        CALABRESI, HALL, and LIVINGSTON, *Circuit Judges*.

Appeal from the United States District Court for the Southern District of New York (Buchwald*, J.*) granting summary judgment in favor of defendant New York City Housing Authority ("NYCHA") on plaintiff Rita Walsh's claims of sex-based discrimination in violation of Title VII and the New York Human Rights Law. The district court concluded that NYCHA proffered a legitimate, nondiscriminatory reason for its refusal to hire Walsh as a bricklayer, and that Walsh did not produce sufficient evidence from which a reasonable jury could conclude that the NYCHA's action was motivated in part by sex-based discrimination. We hold that the district court erred by evaluating each piece of Walsh's evidence in isolation, rather than viewing that evidence as a whole. We conclude that because Walsh has proffered sufficient evidence to create a question of material fact as to whether the NYCHA's refusal to hire her was motivated in part by the fact that she is female, summary judgment is inappropriate.

VACATED and REMANDED.

Judge Livingston dissents in a separate opinion.

_____

LAURA SAGER,
Washington Square Legal Services,
New York, NY, *for Plaintiff-Appellant.*

DONNA MARIE MURPHY,
New York City Housing Authority,
New York, NY, *for Defendant-Appellee.*

_____

HALL, *Circuit Judge*:

Plaintiff-appellant Rita Walsh brought this action claiming that defendant-appellee New York City Housing Authority's ("NYCHA") decision not to hire her as a bricklayer was sex-based and thus violated Title VII, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). The United States District Court for the Southern District of New York (Buchwald, *J.*) granted NYCHA's motion for summary judgment as to the Title VII and NYSHRL claims after concluding that no reasonable jury could find, based on the admissible evidence, that NYCHA declined to hire Walsh because she is female. The court declined to exercise supplemental jurisdiction over the NYCHRL claim and dismissed it without prejudice. For the reasons set forth below, we vacate the district court's grant of summary judgment and remand this case for continued proceedings consistent with this opinion.

## Background

On February 24, 2010, the NYCHA interviewed Rita Walsh and five male candidates for five open bricklayer positions, two in Manhattan and three in Brooklyn.[1] A group of four

---

[1] Walsh and the other candidates had already taken and passed a written text for the civil service position of bricklayer administered by the Department of Citywide Administrative Services ("DCAS"). Although the question of whether Walsh met the DCAS's qualifications for the position

NYCHA employees conducted the interviews: Fred Singer and Wanda Gilliam, the Manhattan and Brooklyn Administrators for Skilled Trades, respectively; James Lollo, Technical Advisor to the NYCHA's Technical Services Department ("TSD"); and Charles Pawson, Deputy Director of the TSD. Singer, Gilliam, and Pawson deferred to Lollo's extensive bricklaying knowledge and experience. Lollo asked most of the questions during the interviews, including all of the technical questions related to the tasks bricklayers are expected to perform. Lollo's objective was to determine if the candidate being interviewed had sufficient knowledge of bricklaying and the masonry trades. Each interview lasted from ten to thirty minutes and was immediately followed by a discussion among the interviewers of the candidate they had just interviewed. The interviewers made their hiring decisions collectively. At the time of the interviews there were no female bricklayers employed by the NYCHA, and the interviewers were not aware of any woman who had held that position in the past.

NYCHA human resources representative Osagie Akugbe oversaw the interview process. Akugbe explained the process to the candidates when they first arrived. He informed them that one candidate would not be hired, and that after the interviews he would tell them who had been selected. Akugbe also met with the interviewers to discuss, among other things, the types of questions they should avoid asking. Akugbe sat in on each interview, in part so that he would be able to report to his supervisor the reason that any candidate was not hired. Akugbe had no input in the hiring decisions, however.

---

of bricklayer is contested at the *prima facie* stage of the *McDonnell Douglas* analysis, because we proceed directly to and first consider the pretext stage, *see infra* Discussion, part A, that question has no bearing on our analysis.

Walsh was the fifth candidate interviewed. Her resume stated that since May 1995, she had been a tile mechanic with Local 7 Tile, Marble & Terrazo, a division of the Bricklayers and Allied Crafts Union. The interviewers asked Walsh about her experience working with brick and block. She informed them that she had once constructed a glass block shower at a Home Depot Expo, and that she had done "little things on her own." J.A. 361. At their depositions, Lollo and Pawson expressed that they had been surprised that Walsh had so little experience with brick and block, and that she disclosed that fact so readily. According to Walsh, the interviewers did not ask about her experience with tile, and Lollo asked her only one technical question: how to make a mortar mix.[2] One of the interviewers remarked that some people have family obligations that interfere with their ability to work overtime, and asked Walsh if she was in that situation. Walsh replied that she had no such restrictions. Physical strength did not come up during Walsh's interview.

The interviewers unanimously decided not to hire Walsh and to hire the five other candidates. Walsh testified that after all interviews had concluded, Akugbe took her aside to tell her that she did not get the job, and stated that the interviewers wanted somebody stronger.[3] That evening, upon advice she received from Legal Momentum,[4] Walsh wrote a short note about the interview in which she stated, "I was told I was not strong enough."

---

[2] NYCHA offered conflicting testimony on these issues. Specifically, Lollo testified that he asked Walsh questions about tile and that she answered them all correctly. Additionally, Gilliam testified that the interview revealed that Walsh was not familiar with the tools used for bricklaying or with the task of boiler overhaul, which he considered to be the most significant part of a bricklayer's job in his borough.

[3] Akugbe denies making this statement.

[4] Formerly the NOW Legal Defense and Education Fund, Legal Momentum states on its website: "Legal Momentum's mission is to ensure economic and personal security for all women and girls by advancing equity in education, the workplace, and the courts. We provide an expert legal voice to seek justice for women in law and government policy." LEGAL MOMENTUM, http://www.legalmomentum.org/mission-and-vision (last visited August 24, 2015).

J.A. at 689. Walsh produced the note as part of the record below. NYCHA represents that Walsh was not hired due to her lack of experience with brick and block, and that her sex played no part in its decision.

Walsh brought this discrimination action against NYCHA in the United States District Court for the Southern District of New York, claiming that she was denied the bricklayer position because of her sex in violation of Title VII, the New York Human Rights Law ("NYHRL"), and the New York City Human Rights Law ("NYCHRL"). In December 2013, the district court entered a Memorandum and Order granting NYCHA's motion for summary judgment as to Walsh's Title VII and NYHRL claims, and dismissing Walsh's NYCHRL claim after declining to exercise supplemental jurisdiction over the same. This appeal followed.

**Discussion**

We review de novo a district court's grant of a motion for summary judgment. *Aulicino v. N.Y.C. Dept. of Homeless Servs.*, 580 F.3d 73, 79 (2d Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014). We must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Aulicino*, 580 F.3d at 79–80. This Court has long recognized "the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute

as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks omitted).

Title VII makes it unlawful for an employer to discriminate against any individual based on that person's sex. 42 U.S.C. § 2000e-2(a)(1). Claims of sex-based discrimination under Title VII and the NYHRL are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."). First, plaintiff must establish a *prima facie* case of sex discrimination by demonstrating that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) (internal quotation marks omitted). If the plaintiff successfully establishes a *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *United States v. Brennan*, 650 F.3d 65, 93 (2d. Cir. 2011) (internal quotation marks omitted). If the employer carries that burden, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

A. <u>Prima Facie Case & Legitimate Nondiscriminatory Justification</u>

It is uncontested that Walsh's sex places her in a protected class and that NYCHA's decision not to hire her constituted an adverse employment action. NYCHA argues that our analysis need not proceed past the *prima facie* stage, however, because Walsh has failed to demonstrate that she was qualified for the bricklayer position and that her rejection occurred under circumstances giving rise to an inference of discrimination. In the alternative, NYCHA points to Walsh's admitted lack of experience laying brick and block as the legitimate, nondiscriminatory reason upon which its decision was based. Walsh does not argue that NYCHA failed to meet its burden at the second stage of the *McDonnell Douglas* analysis; instead she argues that the district court erred by concluding at the third stage of that analysis that Walsh failed to offer sufficient evidence from which a reasonable jury may find that sex was a motivating factor in NYCHA's decision.

The Supreme Court has held:

> The *prima facie* case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff.

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal citations and quotation marks omitted).

In part because Walsh's burden at the *prima facie* stage is minimal, *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001), and because Walsh does not argue that NYCHA failed to proffer a legitimate, nondiscriminatory explanation for its adverse

employment action, the *Aikens* approach is appropriate here. We thus proceed directly to the

third step of the *McDonnell Douglas* analysis and determine whether Walsh has produced

evidence "sufficient to permit a rational finder of fact to infer that the defendant's decision

was more likely than not based . . . in part on discrimination." *Aulicino*, 580 F.3d at 80.

B.   Viewing the Evidence as a Whole

A plaintiff's evidence at the third step of the *McDonnell Douglas* analysis must be

viewed as a whole rather than in a piecemeal fashion. *Byrnie*, 243 F.3d at 102 ("At summary

judgment in an employment discrimination case, a court should examine the record as a

whole, just as a jury would, to determine whether a jury could reasonably find an invidious

discriminatory purpose on the part of an employer. A court is to examine the entire record

to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff. A motion for

summary judgment may be defeated where a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may permit the

trier of fact to conclude that the employer unlawfully discriminated." (internal citations and

quotation marks omitted)).[5] No one piece of evidence need be sufficient, standing alone, to

---

[5]    *See also Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) ("Each of these pieces of evidence, by itself, might arguably be insufficient to permit an age discrimination suit to survive summary judgment. Taken altogether as true—as they must be at summary judgment—they are more than enough to support a jury verdict that plaintiff was picked to be 'downsized' in part because of his age."); *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 314 (2d Cir. 1997) ("Finally, the dissent considers the record solely in piecemeal fashion, proffering innocent explanations for individual strands of evidence. The jury, however, will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination and whether the University's proffered explanation is a pretext for that discrimination."); *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) ("Under the convincing mosaic approach, a retaliation case can be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition

8

permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination. To use the apt metaphor coined by Vincent Gambini (one that seems only fitting given the facts of this particular case), a plaintiff may satisfy her burden by building a wall out of individual evidentiary bricks.[6]

The district court erred when it failed to view Walsh's evidence as a whole and instead set aside each piece of evidence after deeming it insufficient to create a triable issue of fact that NYCHA's refusal to hire Walsh was based in part on the fact that she is female.

C. No History of Female Bricklayers at NYCHA

As the district court recognized, "[n]otably, at the time of the interviews, no women were employed by NYCHA as bricklayers, and as far as the interviewers knew, no woman had ever held the position." *Walsh v. N.Y.C. Hous. Auth.*, No. 11 Civ. 6342, 2013 WL 6669381, at *3 (S.D.N.Y. Dec. 16, 2013). Noting that the lack of female bricklayers "does not, by itself, compel a finding of discrimination," the district court concluded, however, that absent additional information pertaining to the quantity and quality of any previous female applicants, it was "unable to infer a discriminatory motive from the absence of female bricklayers at NYCHA." *Id.* at *9. Here, the problem with the piecemeal approach is on full display. Additionally, while the weight of this evidence (and thus the strength of any corresponding inference) would likely be enhanced if it were coupled with data regarding previous female applicants, the absence of such data does not automatically render the absence of female bricklayers irrelevant, not probative, or unfairly prejudicial.

---

only weakly can, when taken as a whole, provide strong support if all point in the same direction." (internal quotation marks omitted)).

[6]    MY COUSIN VINNY (Twentieth Century Fox Home Entertainment 1992).

The district court confronted a similar situation in *United States v. City of New York*, 713 F. Supp. 2d 300 (S.D.N.Y. 2010), a pattern or practice case in which the plaintiff did not proffer statistical evidence aimed at establishing the defendant's past treatment of the protected group. We agree with the court's lucid analysis of that issue in *City of New York*:

> This case was litigated without resort to statistical evidence other than the elephant in the room—the incontrovertible fact that [the New York City Department of Transportation] has never hired a provisional female Bridge Painter. Because this case proceeded without the use of statistics, the Government did not seek an inference of discrimination based on the "inexorable zero" in [the Department's] hiring. Yet evidence of an inexorable zero is still relevant. First, a court cannot help but be circumspect where a municipal department in the country's largest city repeatedly selects only applicants of one sex for job vacancies—after all, zero is not just another number. Second, even in cases where there is a weak inference of an inexorable zero or scant evidence of other women who applied and were rejected, a court should consider that this lack of evidence may itself be attributable to the inexorable zero.

*City of New York*, 713 F. Supp. 2d at 317–18 (internal citations and quotation marks omitted).

NYCHA attempts to diminish the applicability to this case of the court's reasoning in *City of New York* to this case on the basis that Walsh brought an individual disparate treatment claim as opposed to the type of pattern or practice claim at issue in *City of New York*. This tactic backfires, however. In contrast to individual disparate treatment claims, "pattern-or-practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination," and require the plaintiff to "demonstrate that intentional discrimination was the defendant's standard operating procedure." *Reynolds v. Barrett*, 685 F.3d 198, 203 (2d Cir. 2012) (internal quotation marks and brackets omitted). As a result, statistical evidence of past actions is a mainstay of pattern or practice claims; the same is not true, however, of individual disparate treatment claims. *See id.* ("It bears noting that the

heavy reliance on statistical evidence in a pattern-or-practice disparate treatment claim distinguishes such a claim from an individual disparate treatment claim. . . .” (internal quotation marks and brackets omitted)). Thus, the reasoning articulated in *City of New York*—and its conclusion that statistical data is not required for an “inexorable zero” to have probative value—rings all the more loudly in the context of this individual disparate treatment case.

The finder of fact may properly consider the dearth of female bricklayers as one component of its cumulative inquiry. Of course, the absence of contextual or historical data is fodder for NYCHA when attempting to diminish the weight that the finder of fact ultimately attaches the absence of female bricklayers, as is evidence that NYCHA has hired women to fill positions in other skilled trades.

D. Discrepancy in Qualifications & The Interview Process

Walsh argues that her qualifications were superior to those of Joseph Giannotti and Michael Zambino, two of the successful candidates, and that a jury may use those facts to infer a discriminatory motive.[7] The district court cites this Court’s opinion in *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), for the proposition that a plaintiff seeking to prove a discriminatory motive using a discrepancy in credentials faces a weighty burden, specifically, that “plaintiff’s credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in

---

[7] The district court’s Memorandum and Order includes a more thorough discussion of the successful candidates’ qualifications, including those of the three candidates whose qualifications Walsh does not challenge (Fernando Arlia, Emmanuel Sylvester, and Giuseppe Grippi). *See Walsh*, 2013 WL 6669381, at *3–5.

question." *Walsh,* 2013 WL 6669381, at *9 (quoting *Byrnie,* 243 F.3d at 103). The *Byrnie* court, however, began the paragraph immediately following this statement with the following caveat, which is relevant in this case: "Nevertheless, just because the discrepancy between [plaintiff and the successful applicant's] qualifications does not on its own have the strength to create a material issue of fact, that does not mean the discrepancy is stripped of all probative value." *Byrnie,* 234 F.3d at 103. Here, again, it was error to require a single piece of evidence to bear the full weight of Walsh's burden.

There was no tile setter position at NYCHA; bricklayers performed that task. Two of the successful candidates testified that as bricklayers in Manhattan and Brooklyn, they spend between 50 and 90 percent of their time doing tile work. Walsh had ten years of experience working as a tile setter. Giannotti did "a lot of tile work" during the approximately seven years he worked as a maintenance mechanic for the Long Island City Board of Education, and nothing in the record indicates that Zambino had any experience working with tile. From this evidence, a rational finder of fact could reasonably conclude that Walsh was more qualified than at least one of the successful male candidates to perform one of the main tasks—if not the primary task—required of a bricklayer. While this evidence of disparity in qualifications, standing alone, falls short of establishing a discriminatory motive, it is not devoid of all probative value as to that issue.

Perhaps more significant is the evidence Walsh proffered regarding the interview itself that, if credited by a jury, supports her argument that NYCHA's decision not to hire her was motivated in part by sex-based discrimination. Lollo testified that it was his usual practice to ask candidates technical questions on a number of topics. Pawson testified that

the most important thing he considered when evaluating candidates was whether they answered these technical questions correctly. Finally, Walsh testified that she was asked only one technical question, which was on the subject of making mortar mix; she was not asked any technical questions related to brick and block (the area in which her inexperience purportedly prevented her from being hired) or to tile work (which, according to two of the successful candidates, comprises a significant portion of the workload of the position for which she was being interviewed). This evidence is relevant, and when marshalled effectively, may reasonably support an inference that the interviewers did not give Walsh the opportunity to demonstrate her technical knowledge because their minds had been made up before she set foot inside the interview room.

E. Akugbe's Statement

Walsh alleges that after the interviews were over, Akugbe took her aside and told her she did not get the job because the interviewers wanted someone stronger. The district court ruled, *sua sponte*, that the statement was "hearsay by an individual with no decisionmaking authority, where the only evidence that it was made is plaintiff's self-serving testimony and note." *Walsh,* 2013 WL 6669381, at *10. Because NYCHA did not challenge or otherwise raise the admissibility of Akugbe's statement, Walsh was not afforded the opportunity to address that issue. We review the district court's ruling on the admissibility of evidence for abuse of discretion, *see United States v. Gupta*, 747 F.3d 111, 128 (2d Cir. 2014), and hold that such abuse is present here.

First, Akugbe's statement is a significant piece of Walsh's evidentiary proffer, particularly in the context of the district court's piecemeal approach of evaluating the

evidence. To wit, the district court acknowledged the importance of that evidence, stating: "Plaintiff's argument <u>therefore hinges on</u> the probative force of the two comments allegedly made to her on the day of her interview." *Walsh*, 2013 WL 6669381, at *10 (emphasis added). Ruling that such a significant piece of evidence was inadmissible hearsay without permitting Walsh an opportunity to be heard was highly prejudicial to Walsh, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005).

Second, Akugbe's statement as relayed through Walsh's testimony and note, is not inadmissible hearsay. Under the party-opponent exemption, a statement is not hearsay if it was "made by the party's agent or employee within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). Because it is uncontested that Akugbe was employed by NYCHA at the time he allegedly made this statement, applicability of the party-opponent exemption hinges on whether the statement "relates to a matter within the scope of the agency." *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996). The district court emphasized Akugbe's lack of decisionmaking authority, but such authority is not required for Akugbe to be considered an agent of NYCHA. Instead, the declarant "need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement" for the statement "to be deemed within the scope of his agency." *Id.* at 661. Akugbe is a human resources representative and was tasked with facilitating the interview process. He was present when the hiring decisions were made and sat in on the interviews so that he could report why any candidate was not selected—which is, of course, the subject matter of the statement at issue here. Akugbe was also responsible for informing the candidates of the interviewers' decision, which is precisely what he was doing when he

allegedly told Walsh that the interviewers were looking for someone stronger. Akugbe's statement was thus made within the scope of his relationship with NYCHA, and is not hearsay.

To the extent the district court discounted Akugbe's statement because "the only evidence it was made is plaintiff's self-serving testimony and note," concluding that the comment was "not persuasive evidence of discriminatory animus," *Walsh,* 2013 WL 6669381, at *10, further compounded the error. This Court's discussion of the plaintiff's affidavit in the case *Danzer v. Norden Systems, Inc.* is apropos:

> In discrimination cases, the only direct evidence available very often centers on what the defendant allegedly said or did. Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.
>
> At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant. To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because "self-serving") insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits. Such a radical change in the courts' role would be inappropriate not just in the discrimination context, but everywhere.

151 F.3d at 57 (internal citations and quotation marks omitted). It is the finder of fact, not the district court ruling on summary judgment, who must determine the weight and credibility to accord Walsh's evidence regarding Akugbe's statement.

Finally, Akugbe's statement is relevant to the issue of discriminatory motive. "It is the law . . . that stereotyped remarks can certainly be evidence that gender played a part in an adverse employment decision." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) (internal quotation marks omitted). It can hardly be contested that males

are widely considered to be stronger than females. The fact that strength was not discussed during the interview does not cut against a finding of discrimination, as the district court indicated. To the contrary, if the finder of fact credits Walsh's evidence pertaining to Akugbe's statement, the fact that strength was not mentioned tends to support the inference that the interviewers succumbed to a sex-based stereotype because it removes one of the alternative bases on which they could have based their assessment of her strength.

**Conclusion**

Walsh has proffered evidence that—when viewed as a whole—is sufficient to permit a rational finder of fact to infer that NYCHA's decision not to hire her was more likely than not motivated in part by sex-based discrimination. The dissent characterizes our holding today as "com[ing] close to eviscerating the plaintiff's burden at step three of the *McDonnell Douglas* test," Dis. Op. at 25, but we have done no such thing. At bottom, our disagreement with the dissent is factual in nature. What the dissent perceives as weak evidence or mere scintillae, Dis. Op. at 17, 21, 24, comprise a set of facts from which, if proven, a reasonable jury could conclude that NYCHA's proffered reason for not hiring Walsh was a pretext for discrimination. That two members of a panel of this Court view a particular factual record as sufficient to pass muster at the summary judgment stage while the third member views the same record as insufficient does not amount to a change in the substantive underlying law. It is the job of judges to "apply their best judgment, guided by the statutory standard governing review and the holdings of our precedents, to the [decision below] and the record" supporting it, *Chen v. Bd. of Immigration Appeals*, 435 F.3d 141, 145 (2d Cir. 2006). It is inevitable that, some of the time, reasonable judges conducting this process will reach

16

conclusions different from those of their colleagues on the same set of facts. *See id.* Such is the case today, but neither the summary judgment standard nor the well-settled *McDonnell Douglas* framework has been modified as a result.

The judgment and order granting summary judgment entered by the district court are **VACATED**, and this case is **REMANDED** for further proceedings consistent with this opinion.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

I cannot join in the majority's determination that a reasonable jury might conclude that the decision not to hire the plaintiff, Rita Walsh, as a bricklayer was attributable even in part to sex discrimination. By her own admission during the job interview, Walsh, an experienced tile setter, was not a bricklayer. As she candidly stated during the interview when asked about her bricklaying experience, Walsh had "done a glass block shower at the Home Depot Expo," but "[t]hat was pretty much it. . . . I've done little things on my own but nothing, you know." J.A. 267. Given her admission that she lacked any experience in the skilled trade in which she sought a position, it is highly doubtful that Walsh established even a prima facie case. Assuming she did, it is abundantly clear that the New York City Housing Authority ("NYCHA") mustered at step two as persuasive a "legitimate, nondiscriminatory reason" for this failure-to-hire as one could imagine — namely, that Walsh herself admitted to having virtually no bricklaying experience during her interview for the position.[1]

---

[1] This Court evaluates Title VII sex-discrimination claims under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this three-step test, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination," which requires showing membership in a protected class, qualification for the relevant position, an adverse employment action, and circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir.

1

With respect, moreover, the triable case that the majority perceives at step three (supposedly from looking at the record as a whole) is an illusion. The majority's fanciful approach to the summary judgment standard requires the majority, against all evidence in the record, either to equate tile setting and bricklaying, two distinct trades, or utterly to deny the skills associated with bricklaying — skills that Walsh could undoubtedly acquire, but that she does not now have, by her own admission. I cannot agree with the majority's assessment that the record here could support a reasonable jury verdict in favor of the plaintiff. Accordingly, I would affirm for substantially the reasons stated in the opinion of the United States District Court for the Southern District of New York (Buchwald, *J.*).

**I.**[2]

**A.**

2008) (citing *McDonnell Douglas*, 411 U.S. at 802). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason for its action.'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Once the defendant provides such a reason, the burden shifts back to the plaintiff to show that the defendant's explanation was not the only reason for the employment decision "and that [discrimination] was at least one of the motivating factors." *Id.* (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)). To be sure, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[2] The following facts are undisputed, except where otherwise noted.

In the New York City civil-service system, the stated qualifications — as established by the New York City Department of Citywide and Administrative Services ("DCAS") — for the position of Bricklayer include either (1) at least five years of "full-time satisfactory experience as a bricklayer," or, alternatively, (2) at least three years of such experience, plus "sufficient training of a relevant nature . . . to make up the equivalent of three years of acceptable experience."[3] J.A. 279. Applicants undergo a multi-step application process. At the first stage, applicants must pass a written, civil-service examination administered by DCAS. After the examination, DCAS places applicants with a passing score on an "eligible list," providing them with a "list number" based on their examination score. J.A. 276. As openings arise, DCAS refers candidates for interviews based on their list number.[4] The record suggests that interviewers — at least those in this case — expect candidates at the interview stage to have satisfied the bare

---

[3] The Notice of Examination for the bricklayer examination informs applicants that "[b]y the last day of the Application Period, [they] *must* have" the stated qualifications for the bricklayer position. J.A. 275 (emphasis added). However, applicants may take the examination before the City checks their qualifications for the position; the applicants themselves "are responsible for determining whether or not [they] meet the qualification[s]." *Id.*

[4] It is unclear whether, aside from the civil-service examination, candidates are vetted regarding their qualifications prior to being interviewed. Indeed, to the extent the record speaks to this question, it suggests that such review occurs only *after* candidates have received an offer of employment.

DCAS requirements. Interviewers seek to confirm during the interview that applicants possess the basic ability to do bricklaying work, to assess whether they can show up for work on time, and to determine their borough preferences.

DCAS defines the duties and responsibilities of bricklayers.[5] As a general matter, bricklayers "lay[] bricks and masonry to line and grade in or on a given structure or form of work." J.A. 278. "Typical tasks" include "[]lay[ing] brick or masonry units . . . for walls and partitions," "[w]ork[ing] with refractory and insulating units for boiler settings and combustion chambers," "[d]o[ing] fireproofing, block arching, terra cotta cutting and setting," "[c]onstruct[ing] brick masonry sewers and manholes," and various administrative tasks. J.A. 278. According to James Lollo, a bricklayer supervisor for the Technical Services Department, bricklaying work for the City can include wall construction, brick replacement, reconstructing door frames, glass-block installation, incinerator and boiler repair, fireproofing and fire-brick installation inside the trash compactor, fire chamber and flues, and concrete laying. The record is undisputed, moreover, that all bricklayers are expected to perform all duties within the job title.

---

[5] New York City employs bricklayers in the Technical Services Department and the Borough Management Departments. This case involves an application for the latter position. The record indicates that, while the mix of bricklaying work differs between these positions, all bricklayers are subject to the same hiring standards.

4

Bricklayers in the New York City civil-service system also perform tasks ordinarily done by tile setters, a related but distinct trade.[6] Although the parties disagree as to how much tile-setting a New York City bricklayer performs, there does not appear to be a dispute as to the technical differences between bricklaying and tile-setting.[7] As James Lollo, a bricklaying supervisor for the Technical Services Department, testified during his deposition, "[l]aying brick is significantly more difficult than laying tile. . . . [T]o lay brick, plumb, level and square, is extremely difficult . . . ." J.A. 162. Whereas tile-setting involves

---

[6] Brick masonry and tile-setting are generally understood to constitute separate occupations, with different skill sets. The Bureau of Labor Statistics, for example, defines these trades separately, and observes that brickmasons, "often called bricklayers," have higher median pay levels and entry level education requirements than tile setters. Bricklayers generally complete a three to four year apprenticeship in order to "learn the trade," unlike tile setters, who "typically learn by working with experienced installers." And whereas bricklayers "build and repair walls, partitions, fireplaces, chimneys, and other structures," tile setters "cut and place tile." *Compare* UNITED STATES DEPARTMENT OF LABOR: BUREAU OF LABOR STATISTICS, *Occupational Outlook Handbook: Brickmasons, Blockmasons, and Stonemasons*, http://www.bls.gov/ooh/construction-and-extraction/brickmasons-blockmasons-and-stonemasons.htm#tab-2, *with* UNITED STATES DEPARTMENT OF LABOR: BUREAU OF LABOR STATISTICS, *Occupational Outlook Handbook: Tile and Marble Setters*, http://www.bls.gov/ooh/construction-and-extraction/tile-and-marble-setters.htm.

[7] Indeed, Walsh herself recognized the distinction between bricklaying and tile-setting during her interview, stating that, despite extensive experience setting tile, she had virtually no experience in bricklaying. In particular, Walsh stated that she had done only a "glass block shower at the Home Depot Expo," but "that was pretty much it. . . . I've done little things on my own but nothing, you know." J.A. 267.

applying masonry units to a standing structure, bricklaying entails creating a freestanding structure from scratch. In Lollo's words, "[b]uilding a wall is significantly more difficult than putting tile on a wall or on a floor."[8] *Id.*

**B.**

Walsh began the application process in 2005, taking the civil-service written examination on October 15 of that year. She received a passing score, and DCAS placed her 55th on the eligibility list. More than four years later, in January 2010, NYCHA had openings to hire five new bricklayers for Borough Management Departments — three in Brooklyn and two in Manhattan. DCAS sent NYCHA's Human Resources Department a list of eight individuals from the eligibility list, including Walsh. NYCHA then sent letters to each of the eight applicants and, on February 24, 2010, six of them appeared at the agency's Human Resources Department to interview for the five positions. The six candidates who appeared were — in order of their positions on the eligibility list

---

[8] In addition to bricklayers, New York City employs "mason's helpers," who "assist[] bricklayers and cement masons in the preparation and finishing of cement, concrete, brick, tile, and other masonry work." J.A. 280. Technically, the mason's helper position is a stepping stone to becoming a cement mason, not a bricklayer. But the cement mason position no longer exists in New York City, and such work has been performed by bricklayers. City employees testified that mason's helpers often learn many of the skills that bricklayers use, including where to set the block, what kind of mix and mortar to use, how to build a scaffold, and how properly to retemper mortar.

— Ferdinand Arlia, Joseph Giannotti, Michael Zambino, Emmanuel Sylvester, Rita Walsh, and Giuseppe Grippi. At the time of the interview, Giannotti and Grippi worked for NYCHA in non-bricklayer capacities. All interviewees brought resumes, except for Grippi.

Four City employees conducted the interviews: Fred Singer, Wanda Gilliam, James Lollo, and Charles Pawson. Singer and Gilliam were Borough Administrators for Skilled Trades in Manhattan and Brooklyn, respectively. Lollo was a Technical Adviser in the Technical Services Department, and had spent his career as a bricklayer or bricklaying supervisor for the City. Pawson was a Deputy Director for the Technical Services Department.

Overall, "[t]he purpose of [the] questions and the interviews in general," as the district court noted, "was to ascertain whether the candidates had adequate knowledge of bricklaying and could perform the job well, not to determine whether the candidates met the qualification requirements established by DCAS." *Walsh v. N.Y.C. Hous. Auth.*, No. 11 Civ. 6342 NRB, 2013 WL 6669381, at *2 (S.D.N.Y. Dec. 16, 2013). Each interviewer had a different understanding of his or her role. Gilliam had the final say on hiring for the Brooklyn positions, but had no special knowledge about bricklaying. From her experience in similar

7

interviews, Gilliam left it to the representatives from the Technical Services Department — in this case, James Lollo — to ask technical questions; she would ask about borough preferences and the ability to attend work. As she put it, Gilliam was looking for "[s]omeone who could fit into the position of bricklayer, someone who can easily adapt to our, our agency's requirements to do X number of jobs a day, somebody just[, in] general, just a person who can fit into that capacity . . . [with] [s]ome overall knowledge of the job." Singer, as the Manhattan representative, also had the final say over the Manhattan positions, but described the interview process as involving a joint hiring decision made with the technical advisers. He, like Gilliam, had no bricklaying experience. Lollo was the technical expert of the group. He had spent his career as a bricklayer, and felt that his responsibility in the interview was to determine whether applicants "had knowledge of the bricklaying and masonry trades." J.A. 127. Finally, Pawson said little in the interviews. He explained that Lollo asked technical questions, and that his job was simply to sit in on the process.[9]

---

[9] A fifth city employee, Osagie Akugbe, organized and observed the interviews, but was not an official interviewer. Akugbe worked in NYCHA's Human Resources Department and sent the interview letters to applicants. When the applicants arrived, he told them the number of vacancies and described the interview process. Akugbe also spoke to the four interviewers about the interview process, the applicant order, and questions to be avoided. It was also his job to inform applicants about the interviewers'

8

Walsh's interviewers received her resume, which states, in relevant part, that she spent four months at the Tile Mechanic Training Center and worked from 1995 to 2010 as a Tile Mechanic for the Tile, Marble and Terrazo Division of the Bricklayers and Allied Craftsman Union. The portion of the resume about Walsh's tile-setting work adds that her responsibilities include installing tile or marble "on walls and floors," leveling and plumbing tile on walls and floors, "[w]ater proofing" walls, and "cutting and install[ing] saddles [and] soap dishes." J.A. 651.

At her deposition, Walsh stated that she could not recall whether the interviewers gave her any description of the job. They asked some non-technical questions, including whether she had a fear of heights, whether she was able to work in cramped spaces, and whether she was available for overtime. Walsh also recalled that she was asked a technical question about mixing cement.

With regard to her work experience, Walsh testified that "[t]hey asked if I had experience laying brick." J.A. 267. She recounted that she had "done a glass block shower at the Home Depot Expo," but "that was pretty much it. . . . I've

final decisions, and to give employment paperwork to applicants who received offers.

9

done little things on my own but nothing, you know."[10] *Id*. Walsh thus provided the interviewers with a candid (and accurate) assessment of her experience. In response to questioning at her deposition, Walsh elaborated that she has never held the title of bricklayer, and that in her experience working for various companies between 1995 and 2011 as a tile setter, she has never constructed a wall with brick or cement block, never constructed a parapet or block arch, never constructed masonry sewer or manholes, never done fireproofing with brick or worked with refractory or insulating materials — indeed, that she is unaware of what such materials are. Walsh, who had never before applied for a position as a bricklayer, also made clear at her deposition that she has never served an apprenticeship as a bricklayer and that the apprenticeship for tile setter is not the same thing.

Walsh's recollection of her interview as it relates to the discussion of her work experience is generally consistent with that of each of the interviewers.

[10] Bricklayers work with both "brick" and "block" (i.e., concrete block). *See* UNITED STATES DEPARTMENT OF LABOR: BUREAU OF LABOR STATISTICS, *Occupational Outlook Handbook: Brickmasons, Blockmasons, and Stonemasons*, http://www.bls.gov/ooh/construction-and-extraction/brickmasons-blockmasons-and-stonemasons.htm#tab-1 (emphasis omitted) ("Brickmasons and blockmasons — often called bricklayers — build and repair walls, floors, partitions, fireplaces, chimneys, and other structures with brick, precast masonry panels, concrete block, and other masonry materials.").

Gilliam recalled Walsh saying that "she did not have any knowledge of brickwork . . . her experiences were mostly with the ceramic tiles, but that she was a hard worker and a quick learner and that she was willing to do what she needed to do."[11] J.A. 108. Similarly, Pawson and Singer both remembered that Walsh said that she had not worked with brick or block. Finally, Lollo recounted:

> Obviously, [Walsh] has tile experience, you know, being a Local 7 member. And then usually in an interview, we ask people to tell us a little about themselves first. And then when I asked her what specific experience do you have with brick and block, to the best of my recollection, her answer was, to be honest, I don't have any. . . . I was kind of shocked that somebody would actually come, because the title is bricklayer, and come right out and tell everybody you have no experience with brick or block.

J.A. 156-57.

The interviewers unanimously agreed not to offer Walsh a position, citing as the reason her lack of experience with brick and block. At least one person noted that Walsh would have been a good candidate for a mason's helper position, where she would presumably have learned requisite bricklaying skills. Indeed, Akugbe made a notion to that effect — "*consider Mason Help[er]" — on

---

[11] Gilliam also stated that Walsh answered one question regarding boiler overhaul by stating that she was "not aware of" the necessary tools and asking if a mason's helper (at NYCHA, the bricklayer's assistant) could "help with some of those tasks." J.A. 106. Walsh, however, denies being asked questions about this subject.

11

Walsh's resume during the interview process. J.A. 298. After the interviewers made their decision, Akugbe informed Walsh that NYCHA would not be offering her a position. The interviewers extended offers to all five male candidates interviewed that day, although one of these offers was later retracted when investigation established that the candidate lacked the requisite experience.

## C.

On September 12, 2011, Walsh filed suit, claiming that NYCHA discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. Following discovery, NYCHA moved for summary judgment. NYCHA argued that Walsh failed to establish a prima facie case of discrimination or, in the alternative, that no reasonable jury could conclude that NYCHA's rationale for not hiring her was a pretext for discrimination on the basis of sex. The district court issued a memorandum and order granting summary judgment to NYCHA on December 16, 2013. *See Walsh*, 2013 WL 6669381, at *11.

The district court noted that "[i]t is far from clear that plaintiff possessed

12

the necessary qualifications to become a bricklayer," but elected to assume without deciding, given the minimal burden of establishing a prima facie case, that Walsh's time as a tile setter qualified her for the bricklayer position and that the circumstances surrounding the interview raised an inference of discrimination. *Id*. at *8. Judge Buchwald went on to note, however, that NYCHA had a legitimate, nondiscriminatory reason for choosing the five male candidates over Walsh: namely, that she "admittedly [had] extremely limited experience with brick and block." *Id*. at *9.

With this explanation in mind, the court turned to whether Walsh had "produced evidence from which a rational jury could find that gender was more likely than not a motivating factor in NYCHA's refusal to hire her." *Id*. As relevant here, the court assessed evidence put forward by Walsh that: (1) NYCHA has never had a female bricklayer so far as the interviewers recalled; (2) plaintiff supposedly had superior qualifications to other candidates who were hired; and (3) Akugbe allegedly informed Walsh at the time of her rejection that the interviewers rejected her because "they wanted somebody stronger." *Id*. The district court concluded that this evidence "falls short of raising a triable issue of fact that NYCHA's refusal to hire [Walsh] was based on her gender." *Id*. The

district court therefore granted summary judgment for NYCHA on Walsh's Title VII and New York State Human Rights Law claims. *Id*. at *10-11. However, because a more liberal standard applies to discrimination claims under the New York City Human Rights Law, the court declined to exercise supplemental jurisdiction over that remaining claim and dismissed it without prejudice. *Id*. at *11. This appeal followed.

**II.**

We "review a district court's decision to grant summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)). Title VII makes it unlawful for an employer to "refuse to hire . . . any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "An employment decision, then, violates Title VII when it is 'based in whole or *in part* on discrimination.'"[12] *Holcomb*, 521 F.3d at 137 (quoting *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004)). "In assessing the record to determine whether there

---

[12] The substantive standards for liability under the New York State Human Rights Law are "analytically identical" to those "under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997)).

14

is a genuine issue to be tried" in Title VII cases, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253 (1981).

Walsh has not adduced sufficient evidence to raise a triable issue of fact on this ultimate question. In arguing to the contrary, the majority contends that the district court "failed to view Walsh's evidence as a whole." Maj. Op. at 9. Examining each piece of evidence on which the majority relies, however, it is clear that whether viewed item-by-item or all together, the evidence here is simply inadequate to support a reasonable conclusion, at step three, that NYCHA's "proffered, non-discriminatory reason" for not hiring the plaintiff — namely, that she lacked bricklaying experience — was "a mere pretext for actual discrimination."[13] *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see*

---

[13] As already noted, I have my doubts that Walsh raised even a prima facie case. Because the majority proceeds to step three, however, and because it does not matter whether the plaintiff made out a prima facie case where, as here, "the defendant has done everything that would be required [at step two]," I also proceed to step three of

15

*also Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) ("[P]laintiff must prove that a defendant's proffered reasons were not the true reasons for its actions but a pretext for discrimination.").  To be sure, "bits and pieces" of evidence, when viewed together, may form a "mosaic" of discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).  But the obligation to look at the record as a whole does not afford reviewing courts a license to "[t]roll[ ] for an issue of fact," *Weinstock*, 224 F.3d at 41, contrary to this court's recognition that the "salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to . . . other areas of litigation."  *Id*. at 46 (alteration in original) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)); *see also Aikens*, 460 U.S. at 716 (noting that neither trial courts nor reviewing courts "should treat discrimination differently from other ultimate questions of fact").

The majority first points to evidence that at the time of Walsh's interview, no women were employed by NYCHA as bricklayers and, so far as the

---

the *McDonnell Douglas* framework.  *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

16

interviewers knew, no woman had held this civil service position.[14] But on the record here, this evidence is of no appreciable weight — maybe not even a scintilla — in establishing that there was intentional discrimination in the decision not to hire *Walsh*. In individual disparate treatment cases, contrary to the majority's claim, "statistical evidence is less significant than in disparate impact or pattern and practice cases, because the ultimate issue is whether a particular plaintiff was the victim of an illegitimately motivated employment decision." 21A Federal Procedure, Lawyers Edition § 50:1021 (2016); *see also United States v. City of N.Y.*, 717 F.3d 72, 83 (2d Cir. 2013). This general proposition is particularly apt here, moreover, where the statistical evidence at issue — the absence of women among NYCHA's bricklayers — is presented devoid of *any* necessary contextual information as to how many women have applied for positions as bricklayers at NYCHA, the nature of their qualifications, or even the time period at issue and the number of bricklayers that NYCHA employed during that time.[15] *Cf. Pollis v. New Sch. for Soc. Research*, 132 F.3d 115,

---

[14] Interviewers testified that they were familiar with women in other skilled trades at NYCHA such as plumbing, plastering, painting, and carpentry.

[15] This is in stark contrast to *United States v. City of N.Y.*, 713 F. Supp. 2d 300 (S.D.N.Y. 2010), on which the majority relies. In that pattern or practice case, as the district court's opinion reflects, the New York City Department of Transportation

17

123 (2d Cir. 1997) (concluding that because the relevant statistical group was "so tiny, was spread over such a long period, and was composed so largely of individuals who were not fairly comparable to her," plaintiff's statistics "[did] not support an inference about the School's motivations" and evidence lacked "logical tendency to show that discrimination was present"). The majority notes that an "inexorable zero" may sometimes support a "weak inference" of discrimination in the pattern-or-practice context, citing *United States v. City of N.Y.*, 713 F. Supp. 2d at 318. But on the record here, that unadorned number says nothing about whether this particular group of interviewers declined to hire Walsh because of her sex, at least absent "[m]ore particularized evidence relating to the individual plaintiff[ ]." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 95 (2d Cir. 1984); *see also Weinstock*, 224 F.3d at 46 (noting that raw data "purportedly

("DOT") employed about 40 in-house bridge painters from 1996 to 2001. *Id.* at 306. No women were included among this number, and no women were hired as a result of three successful job postings during this period. Significantly, the district court opinion reflects *both the number of men and women in each applicant pool and the qualifications of applicants*. *Id*. at 311-14. Noting that the case had been litigated "without resort to statistical evidence other than . . . the incontrovertible fact that DOT [had] never hired a provisional female Bridge Painter," the district court suggested that in the circumstances, the absence of women was relevant, albeit perhaps only weakly so. *Id.* at 317-18. At any rate (and unlike here) "[r]egardless of the weight given to the total absence of female hires, the remaining anecdotal evidence," the court concluded "was more than sufficient to show that DOT lacked consistent hiring standards . . ., that less qualified men were given preferences over more qualified women, and that the disparate treatment was intentional appeasement of DOT's existing all-male workforce." *Id.* at 318.

18

describing a pattern of under-representation and unequal opportunity for women faculty at Columbia . . . provid[ed] no foundation for the assertion that there was discrimination" in a *particular* woman's tenure process).

There is no such particularized evidence in this record. The majority endeavors to find some discrepancy in qualifications, opining that "a rational finder of fact could reasonably conclude" that Walsh's *tile-setting* experience was superior to that of Zambino, one of the five men offered employment on the day that Walsh interviewed.[16] Maj. Op. at 13. Even assuming that Walsh is a qualified tile setter, however, she told the interviewers that she had no experience with brick or block — a proposition that includes wall construction, block arching, fireproofing, boiler repair, constructing brick masonry sewers and manholes, and the many other bricklaying tasks that NYCHA bricklayers routinely perform. While the record does not discuss Zambino's interview, Zambino's resume, in contrast, states that he performed "[p]ointing, cleaning and caulking brick work" for Blade Contracting, as well as "[m]asonry restoration . . . , [w]aterproofing . . . , [lintel] replacement, [masonry] work." J.A. 680. It also shows that he completed four courses at the International Masonry

---

[16] The majority does not even attempt to suggest that Walsh's qualifications were equal to (much less superior than) any of the other four candidates.

19

Institute, receiving a "Pointer, Cleaner, Caulker Certificate." J.A. 681. Zambino's job offer, moreover, was later retracted when it was determined that, in fact, he *lacked* the requisite five years of bricklaying experience. But at the time of the interview, Zambino, like the other four successful applicants, presented himself as having bricklaying experience. Walsh did not.

The majority endeavors to sidestep this basic problem — that Walsh lacked bricklaying experience, and admitted as much in her job interview — by pointing to evidence that some bricklayers at NYCHA do a substantial amount of tile work. The record is undisputed, however, that bricklayers at NYCHA must be proficient in *all* duties under the job title, including brick and block construction, masonry repair, and boiler overhauling. As Wanda Gilliam, Borough Administrator for the Skilled Trades in Brooklyn put it, "bricklayers are supposed to perform all kinds of tasks," and "[w]e don't know what's on the work orders until they get the job." J.A. 86. It is thus irrelevant, even if true, that Walsh has more tile-setting experience than Zambino, given her professed *lack* of experience in bricklaying. As we recently stated, Title VII prohibits *discrimination*: It "is not an invitation for courts to 'sit as a super-personnel department that reexamines' employers' judgments," whether related to the

20

proper standards for tenure or for proficiency in bricklaying. *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73 (2d Cir. Oct. 28, 2015) (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (per curiam)); *see also Weinstock*, 224 F.3d at 43 (noting that court's "role is narrowly limited to determining whether an illegitimate discriminatory reason played a motivating role in the employment decision" (quoting *Bickerstaff*, 196 F.3d at 456)); *Bickerstaff*, 196 F.3d at 455 (observing that "Vassar alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them").

Recognizing the weakness in its position, the majority hurries on to note that "[p]erhaps more significant" than the supposed discrepancy of skills between Walsh and Zambino is the evidence that, according to Walsh, she was asked only one technical question during her interview. Maj. Op. at 12-13. But it is the majority that now fails to assess the record as a whole. Perhaps such a fact could be probative in another case, but it is wholly inadequate to raise an inference of discrimination here, and for one simple reason: namely, that given Walsh's admitted lack of bricklaying experience, it is hardly surprising that the interviewers declined to press her on the intricacies of the field. In any event, even drawing all inferences in Walsh's favor, it is in fact unclear whether the

21

interviewers asked Walsh fewer technical questions than they did the others. Walsh testified that an interviewer asked her about mixing cement and about her bricklaying experience, but did not ask any questions about bricklaying techniques. Giannotti recalled receiving a similar pair of questions, while Sylvester remembers being asked only about the tools used for bricklaying and tile cutting. The record lacks information about the other candidates' interviews.

That brings us to the single piece of evidence on which the majority really relies: namely, that Akugbe supposedly told Walsh, after her interview, that the interviewers "wanted somebody stronger."[17] J.A. 638. The record is undisputed that physical strength was not discussed during Walsh's interview. According to both the interviewers and Akugbe (who was not a decisionmaker, but there to assist in the interview process) there was also no discussion among the decisionmakers about any need for physical strength, as opposed to experience.

Setting this aside, however, and properly assuming, at the summary judgment stage, that Akugbe did, in fact, make the statement attributed to him by Walsh, there is a more fundamental problem: namely, that Akugbe's alleged

---

[17] Walsh testified that Akugbe made this comment after informing her that NYCHA would not be offering her a position and saying that he was "sorry" and had been "rooting for [her]." J.A. 637. Akugbe denies telling Walsh either that he hoped she would be selected or that the interviewers were looking for someone stronger. J.A. 64.

statement very plausibly could refer not to Walsh's physical strength (and to gender stereotypes about physical strength) but to Walsh's near total lack of experience and to the fact that she was not a *strong* candidate, in light of her inexperience as a bricklayer. In such circumstances, where a remark is susceptible of two or more meanings, only one of which may be relevant to discriminatory intent, it is "perfectly appropriate" for a court at the summary judgment stage (as we have said in the past) to ask whether a reasonable finder of fact, considering such a remark, "could conclude from both [the] remark and other evidence in the record that [the plaintiff] met her burden of proving pretext."[18] *Govori v. Goat Fifty, L.L.C.*, 519 F. App'x 732, 735 (2d Cir. 2013); *see also Weinstock*, 224 F.3d at 43-44 (rejecting argument that referring to female professor

---

[18] This conclusion is consistent with the approach of our sister circuits. *See, e.g.*, *Spokojny v. Hampton*, 589 F. App'x 774, 781 (6th Cir. 2014) ("[Plaintiff] cannot show that discrimination was a motivating factor by using a combination of remote, conclusory, isolated, unrelated, and ambiguous statements."); *Yue Yu v. McGrath*, 597 F. App'x 62, 67 (3d Cir. 2014) ("[E]mployee's subjective belief in invidious nature of isolated and ambiguous comment does not support inference of discrimination.") (citing *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008)); *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013) (stating that "ambiguous or isolated comments that stand alone are insufficient" to survive summary judgment); *Wagoner v. Pfizer, Inc.*, 391 F. App'x 701, 708 (10th Cir. 2010) ("First, even at the summary judgment stage, 'stray remarks,' and 'isolated or ambiguous comments are too abstract . . . to support a finding of age discrimination.'" (quoting *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994))); *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000) (explaining that a plaintiff cannot establish a prima facie case based on "vague, ambiguous, or isolated remarks").

as "nice" and "nurturing" in regard to teaching could, without more, establish discriminatory intent in evaluation of scholarship for tenure); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . ."). Here, the record is undisputed that the plaintiff admitted during a job interview to lacking the requisite experience in a skilled trade. Setting aside the alleged remark, there is no meaningful evidence of discriminatory intent. In such circumstances, and even considering Akugbe's alleged remark, Walsh simply has not put forward a case to support a reasonable jury verdict.

* * *

With this decision, the majority comes close to eviscerating the plaintiff's burden at step three of the *McDonnell Douglas* test. NYCHA proffers a powerful reason (perforce a "legitimate, nondiscriminatory reason") for declining to hire Walsh: namely, that she admitted during her job interview to lacking the required experience in a skilled trade. Walsh herself concurs in this account of what she said. The majority nevertheless concludes that Walsh has assembled just enough evidence, considered as a whole, to permit a reasonable trier of fact to draw the inference that this reason was pretextual, and that NYCHA

24

discriminated against her on the basis of sex. With respect (and knowing the evidence on which the majority relies), one is left wondering what the majority means by "reasonable" and "inference."

The majority's approach to the summary judgment standard as applied to hiring decisions may perversely disserve those who seek work in fields in which they have been historically underrepresented by creating incentives on the part of employers to interview only those with impeccable paper credentials — those with formal training and evident work experience, and not those who may have the requisite knowledge and experience notwithstanding a lack of formal credentials.[19] Regardless, the law is clear that the plaintiff at step three must produce "not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" *Weinstock*, 224 F.3d at 42 (quoting *Van*

---

[19] The majority invokes the film *My Cousin Vinny* in its discussion of the role of circumstantial evidence in Title VII cases. *See* Maj. Op. at 9 & n.6. The film might more aptly be cited for the proposition that some individuals, such as Mona Lisa Vito, Vinny Gambino's fiancée who gained expertise in automotives and auto mechanics working in her father's garage, are well qualified despite a lack of formal credentials. To avoid the possibility of creating disincentives to interview such people, courts might simply follow the Supreme Court's admonition that they should not "treat discrimination differently from other ultimate questions of fact," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).

*Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).  That standard has not been satisfied.  I respectfully dissent.